698 So.2d 1100 (1995)
Richard Eugene GADDY
v.
STATE.
CR-90-1429.
Court of Criminal Appeals of Alabama.
May 26, 1995.
Rehearing Denied December 29, 1995.
*1107 William K. DelGrosso, Birmingham, for appellant.
Jeff Sessions and Bill Pryor, attys. gen., Lisa Gunter and David Bjurberg, asst. attys. gen., for appellee.
McMILLAN, Judge.
The appellant, Richard Eugene Gaddy, was charged with capital murder for causing *1108 the death of James Caldwell by stabbing him with a knife, during the course of committing a theft, see § 13A-5-40(a)(2), Code of Alabama 1975. The appellant was found guilty as charged and, following a sentencing hearing, the jury returned an advisory verdict of death by electrocution. The final sentencing hearing was held before the trial court and the trial court followed the jury's recommendation, sentencing the appellant to death by electrocution.
The trial court, in its order imposing the death penalty, properly sets out the evidence introduced at trial and the trial judge's findings of fact as follows:
"State's case:
"James A. Caldwell was fifty years of age at the time of his death, lived alone in the East Lake part of Birmingham, Jefferson County, [and] was employed as a math teacher at Huffman High School.
"Co-worker Robert McCary last saw deceased alive on Friday, December 8, 1989.
"On the following Wednesday, McCary and the school principal, Robert Simmons, became suspicious about Mr. Caldwell's absence from work and went to his apartment having called the Birmingham Police Department for an officer to meet them at the home.
"Mr. Caldwell was observed [through] the mail slot in the door lying prostrate in a pool of blood behind the door.
"Mr. McCary, coach and driver's education teacher at Huffman High School, and Robert Simmons, the principal, gave their testimony [regarding] their observations at the Caldwell residence.
"Dr. Gary Simmons, forensic pathologist, described multiple incised wounds (longer than deep) and stab wounds to the person of the deceased, said wounds being depicted as being about the deceased's head, neck, left ear, chest, abdomen and palm of hand. [He also described several abrasions.]
"Dr. Simmons detailed nineteen incised and/or stab wounds as well as detailing evidence of `severe strangulation,' adduced from `pinpoint' hemorrhaging in the eyes. Dr. Simmons stated that strangulation was not the cause of death, that the decedent was alive when he was being stabbed as evidenced by the hemorrhaging from the wounds.
"According to Dr. Simmons, toxicology revealed no evidence of drug or alcohol ingestion by the deceased, serology testing revealed no evidence of semen in any body cavity.
"Larry Chapman, deputy sheriff in Saluda [County], South Carolina, stopped the defendant and two other males in the deceased's automobile on December 13, 1989, in Saluda County, South Carolina. The defendant was seated in the back seat of the automobile.
"The jurors were not allowed to hear that a BOLO (be on the lookout) had been issued [regarding] the vehicle because of two robberies committed in South Carolina, the defendant being videoed in the commission of one of the robberies. Prior to being brought to Alabama for the trial of the capital murder of Mr. Caldwell defendant entered guilty pleas to two robbery offenses in South Carolinathe guilty pleas being admitted on cross-examination of the defendant in the guilt phase for purposes of impeachment.
"Larry Chapman and Lt. George Booth with the South Carolina State Police testified about some of their activities with the defendanttestifying from a `sanitized' or redacted inculpatory statement.
"The defendant's statement[s], post Miranda and deemed voluntary by the undersigned, given to Lt. Booth, comprised the main thrust of the state's case against defendant Gaddy. The statements follow, absent the Miranda preamble.
"December 14, 1989
"`In the last of October when I left Augusta, Georgia hitchhiking, I was headed nowhere particular, I headed for Atlanta, Georgia. I knew it was big enough to make money and to roll people. I stayed in Atlanta, under a bridge one night. I couldn't find anybody who had anything to roll in Atlanta. So I hitchhiked on down I-20 to Birmingham. I slept outside and I got sick. I went to the Mission when I got to Alabama. I *1109 got up with James Sanders. He pulled up and asked me if I wanted to work. I went to work with him at the carnival. I worked one day. That was October 31, 1989. I worked at the race track with his wife. She would get me a visitor's pass. I also helped them around the house. On the 8th of December, James and his wife asked me to leave. I left on Friday and I slept in the park. On Saturday the 9th of December, 1989, I fooled around, I just bought time until dark until I could find somebody to roll and have the cover of night. I got up on 59 or I-20 hitchhiking, a man, a white man, stopped and I got in the car. He asked me if I wanted to get something to eat. I knew then that he was gay. I knew then that it would be easy to get to his house to roll him and to rob him. This was about 6:00 to 6:30. He told me his name was Jim. We went to his house. He turned on the TV and I was cold and I sat by the heater. About 7:30 he started acting like he was going to freak out or something. He was laying on the couch and I was sitting on the couch. His bed was right across from the couch. He was wearing a white T-shirt, black or navy pants, I was wearing blue jeans and insulated coveralls and a red, white and blue jersey shirt and tennis shoes that night. I got up and I moved toward him and reached behind my back for the knife that I had concealed. It was a paring type knife with a 4½ to 5 inch blade. I had filed the blade to a double edge knife and made it a combat point. He grabbed my hand as soon as I came around with the knife. He was lying down and started to sit up. I moved with an upward thrust, stabbing him in the chest. He grabbed my hand and I stabbed again, but I am not sure I stabbed him that time. Jim got the knife and we were fighting. He came up off the couch and I got around behind him in the fight. Jim said, "Just leave. As I tried to get the knife from him he got to the door and got it unlocked but not opened. During that struggle from the bed to the couch to the door, my right hand was cut between the thumb and index finger. My left hand got a puncture in the palm. I reached in my back pocket and got a piece of white nylon rope a quarter inch thick about 40 inches long. I wrapped it around Jim's neck. Jim got the knife between the rope and his neck and cut the rope [in two]. I had some of the rope wrapped around my hand. I let some of it unwrap from my left hand, reached around and grabbed the loose end with my right hand pulled it back around Jim's neck and choked him until he was either dead or passed out. I took the knife and stabbed him three more times in the throat below the Adam's Apple. I let him lay for awhile and searched the rest of the house. The house was junkie. I stole old coins, collections, paper money, loose change, gold and silver rings and a pair of binoculars. I went back over to Jim and I took a small gold ring off his right pinky finger, a nine diamond cluster ring. Then I got his wallet, car keys and money about $60.00 in his pocket and later I found more cash in the wallet and money hid in the old paper money collection. I put it all in a sack, a plastic sack. I turned out all the lights in the house. Before I turned off the lights, I washed the blood off of my hands. When I went out of the house I locked the front door with the key so no one could easily find him. I went out to the car and got in and drove off. I went back and picked up my clothes where I had them stashed. I headed for Augusta, Georgia. When I crossed into Georgia on I-20 I rolled the window down on the passenger's side and threw the knife out while I [was] still moving. When I got to Atlanta, Georgia, I stopped and changed my clothes, I put the clothes I took off in a trash bag and put them back into [the] car. Every 10 to 15 miles I threw out pieces of clothing out the car until they were gone. I was about 5 miles out of Atlanta and threw clothing out the passenger window of the car. When I got back to Bath, I rented a motel room so I could go through the stuff to see what I had, I separated it into what I thought was valuable and *1110 what was not valuable. On Monday I started selling some of it. Monday, I went over to a friend's house, Tony Yarborough. I asked him if he would take some rings and money collection to the pawn shop to sell it. He said he could try to sell the rings at the pawn shop. He didn't know anything about the coins but he would try some coin shops. Tony did not know anything about the car being stolen or the murder. We went to the Gordon Military Pawn Shop on Broad Street. Tony and I went in and had him look at all the rings which was about 25 or 30. Some had settings and some were just settings with the setting removed. Some of them were silver. The man said they did not buy silver. There were only 2 rings he wanted. By this time I had read the papers in the car and I knew the man's name was James Caldwell. One of the rings that the man bought at the pawn shop was the ring I took off of Jim's pinky finger. A nine diamond cluster ring. The other was a solid 10K gold ring with the setting removed. The rest of the rings I sold for $5.00 or $10.00 or traded for Crack on Hwy 278 in Aiken County, I believe. I traded the binoculars for crack rock. We took paper money to a coin shop in Augusta and sold some of it for $60.00. I still had some paper money and the coins and stamp collection when I was arrested in Saluda County, December 13, 1989.'"
"December 15, 1989
"`My name is Richard Eugene Gaddy. The day is Friday, December 15, 1989. The time is 6:00 p.m. I gave a statement on Dec. 14, 1989 about James Caldwell. I told officers that I had thrown my insulated jumpsuit out of the car with the clothes I was wearing between Atlanta, GA and Augusta, GA on Sunday Dec. 10, 1989. I did throw the clothes out of the car and my shoes but I did not throw the jumpsuit out. I kept it and left it at the house of David Foreman in Aiken County. I left it there with other things that I won when we went to Johnston on Dec. 13, 1989. [Concerns a robberyredacted.]
"`On the night of Sat. Dec. 9, 1989, I was wearing the jumpsuit when Jim Caldwell picked me up in his car. When we got to Jim's house we went inside and I took the jumpsuit off because it was raining outside and the jumpsuit was wet. I stood by the heater wearing a pair of blue jeans, while I was getting warm. After the incident took place, I had blood on my pants. Before I left Jim's house I put on my jumpsuit to hide the blood which was on my pants. On the way from Birmingham to Augusta, I stopped at Conyers, GA at the Waffle House, went in the bathroom and changed my clothes.
"I put the jumpsuit in the car, and between Atlanta and Augusta, GA, I threw the clothes out of the car.'"
"Defense case:
"The defense case featured the testimony of Katrina Ward, who testified that she had seen the defendant at the deceased's apartment or in the yard area on occasions prior to December, 1989, the testimony of Sgt. Horace Duncan of the Birmingham Police Department who stated, among other things, that he did not attempt to elicit another statement from defendant Gaddy, that he (Duncan) and the D.A.'s office thought that the South Carolina law enforcement people had done a good job and that there was no need to interview the defendant.
"Further, Lt. Booth was recalled to testify that he did not inform the defendant that he was charged with capital murder (vs. murder), a crime that could carry the death penalty in Alabama.
"The defendant testified, in contradiction to his statement to Lt. Booth, that he had known the deceased prior to December, 1989, having initially been picked up by the deceased on the highway as defendant was hitchhiking in late July, 1989, that he spent several days with the deceased at the apartment in Woodlawn, performing homosexual activities for money.
"The defendant stated that he departed Birmingham for Texas to live with his sister but that in the second week of September *1111 he was back in Birmingham at the Caldwell residence and stayed one night before going to South Carolina. Defendant described allowing the deceased to perform oral sex on him for money on this occasion.
"Defendant went to South Carolina for about four weeks and then states that he came back to Birmingham in late October, now for the third time, stay[ed] a night at Mr. Caldwell's apartment [and] engaged in homosexual activities.
"Defendant stated that he worked as a carnival laborer and at the race track, living with a married couple that owned the carnival. This arrangement lasted until Friday, December 7, 1989, at which time the defendant [went] back to Mr. Caldwell's apartment.
"The defendant stated that he drank five or six beers waiting for Mr. Caldwell to come home, that Mr. Caldwell [came] home, they [had] a sexual encounter, [went] out to eat dinner, [and] that he stay[ed] Friday night at the Caldwell apartment.
"Defendant stated that the deceased disgusted him (Gaddy) when the deceased mentioned having "access" to young boys fourteen and fifteen years old.
"Saturday, the day of the killing, the defendant state[d] that Mr. Caldwell dropped him off at Shoney's in the morning, that the defendant smoked some marijuana and drank some beer walking around the neighborhood waiting on Mr. Caldwell to return home. The two met at the Caldwell apartment about 6:00 p.m.
"Defendant describe[d] the deceased as having] fondl[ed] him (Gaddy), reach[ed] over and [gotten] defendant's knife and start[ed] to jab at the defendant[;] defendant says he blocked a knife jab, that the two wrestled over that knife and that things got out of hand and that he killed Mr. Caldwell in self-defense or killed only having been provoked, stating, `I'm sorry the man is dead. But Iit went out of control at his instigating.'
"The defendant admitted choking the deceased with a rope stating that he was trying to get `control of the situation.'
"Further, defendant stated that he took a `pinkie ring' off the deceased's little finger and money from his pockets, described how he exited the apartment, how he fled to South Carolina in the decedent's car, how he discarded bloody clothing and the knife, pawned certain of the items or traded others for crack cocaine, injecting and smoking the cocaine in South Carolina; further, that he pulled two robberies while `on the run' in South Carolina.
"Defendant stated that he lied to Lt. Booth in an effort to cover up the homosexual activity, not wanting to go to jail as a reputed homosexual, that it would go hard on him if the inmates thought he was a homosexual, that as an adolescent he had been sexually abused by his cousin and stepfather."

I
The appellant argues that his statement was improperly allowed into evidence, because, he says, it was involuntary. He bases this claim on three grounds: that his statement was improperly induced by an officer's promise to make his cooperation known to the court; that the State failed to lay a proper voluntariness predicate by providing evidence that no threats or promises were made in order to induce the statement; and that the statement was involuntary considering the totality of the circumstances, specifically that the appellant has only a tenth-grade education, had been smoking crack cocaine earlier on the day he made his statement, and the inaccuracy of the testimony of the interrogating officer concerning the substance of the statement in relation to the amount of time in which it took to make the statement.

A
The appellant alleges that he was improperly induced into making a statement by the interrogating officer in South Carolina. He refers to the officer's testimony that, before the appellant made his statement, the officer told him that he would make his cooperation known to the court.
*1112 The record indicates that, during a pretrial motion to suppress, the interrogating officer from Saluda, South Carolina, Lieutenant Booth, testified that he had been alerted that a vehicle containing four suspects had been stopped following an armed robbery, which had occurred in Johnston, South Carolina.[1] The men were taken to a holding cell in the county jail in Saluda. The subjects, including the appellant, were questioned regarding the armed robbery; the officers had no knowledge of any other crimes at that time. The appellant signed a waiver of rights form and gave a statement concerning the armed robbery. He subsequently gave additional information concerning another armed robbery that had occurred close to Aiken, South Carolina, and Augusta, Georgia. Officers from those locations were contacted, and the appellant cooperated with them concerning those robberies. The interrogating officer, Lieutenant Booth, stated that he then asked the appellant about the car he was driving. The appellant responded that he had no information about the car, and the interrogating officer stated that he would get additional agents, if necessary, to "canvas" the Aiken, South Carolina, area. The appellant then indicated that his acquisition of the car involved "a more serious crime." The interrogating officer then stated that he took another waiver of rights form and wrote in "murder," again, advised the appellant of his rights, and took a statement concerning his involvement in the death of a school teacher in the area of Birmingham, Alabama. The officer was subsequently asked if he promised the appellant anything or used any threats of force or violence in order to obtain the statement. The officer responded, "No, sir, we didn't. There was no coercion, no threats, no promises of reward or hope for reward." The officer stated:
"Mr. Gaddy and I talked at great length about the other crimes. And we got to this one, he had kind ofhad a feeling for how I did business, and I understood him. He wasI found him to be truthful, and I didn'tyou know, there were no promises made.
"I told him that when this casewhen and if this case came to court, that I would not have any problem relating to the Judge or a jury that he was cooperative, and found him to be truthful."
The prosecutor then asked the officer if, in his opinion, the statement was given of the appellant's own free will, to which the officer responded, "Yes, sir." Following this testimony from the officer, which was taken over the telephone, the court informed the witness that he would be required to testify in court at the time of trial.
Thereafter, following the striking of the jury, Lieutenant Booth testified outside the hearing of the jury in response to questions by the defense counsel as follows:
"Q. Now, of course, when he gave this statement about the murder, he knew you all had interviewed him first about a robbery, hadn't you?
"A. That's correct.
"Q. And you told him, I think we talked about this on the phone, that you basically told him that you will make his cooperation known to the Court and went ahead and gave his statement?
"A. That is correct.
"Q. And you have done that?
"THE COURT: On the telephone, yes.
"Q And I believe we all heard it?
"THE COURT: On the telephone, yes. And I believe it should be stated on the record that there was an offer made in settlement of the case."
The appellant cites Ex parte Weeks, 531 So.2d 643 (Ala.1988), in support of his argument that the officer's offer to make the appellant's cooperation known to the court constituted an improper inducement, rendering the appellant's statement involuntary and that it therefore should not have been admitted into evidence. In Ex parte Weeks, supra, the Alabama Supreme Court found improper an officer's statement to a defendant that "`[He] wanted his cooperation in this matter' and that if he confessed to his part in the burglary `He [the officer] would make it known to the district attorney.'" Id. at 644. *1113 The Court cited Womack v. State, 281 Ala. 499, 205 So.2d 579 (1967), a murder case in which the defendant was told that "it would `go lighter' on him if he talked. 281 Ala. at 506, 205 So.2d at 585." Id. The Court, in Womack, determined that the statement constituted an improper inducement and that it gave the defendant "`real hope for lighter punishment.'" Id. See also Prince v. State, 584 So.2d 889, 894 (Ala.Cr.App.1991) (this court held that, considering the totality of the circumstances, an officer's statement "that things could be worked out and that he knew that a capital murder charge would not `stay' on the appellant, by its nature, could have generated such a hope in the appellant that he may have been improperly induced to make his statement").
However, the situation in Ex parte Weeks, supra, is distinguishable from that in the instant case. The officer in Ex parte Weeks actually bargained with the defendant, by stating that if the defendant confessed, he would make his cooperation known to the district attorney. In this case, the officer informed the defendant that he was going to make his cooperation known to the court unconditionally; thus, the confession was not actually "bargained for" or directly induced. Moreover, in Ex parte Weeks, supra, at 644, the officer acknowledged on cross-examination that he would "`give something favorable to [the defendant] if he would help.'" In the present case, the interrogating officer consistently stated that he made the appellant no promises and offered no hope for rewards. The officer simply told the appellant that he would make his cooperation known to the court and, subsequently, stated that he in fact did so.
"`Generally, the line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police.
"`... [T]he cases indicate that government agents may validly make some representations to defendant or may discuss cooperation without rendering the resulting confession involuntary. Thus, government agents may initiate conversations on cooperation, and may promise to make defendant's cooperation known to the prosecutor or the court, so long as the interrogators make it clear that they have no power to grant immunity or confer other benefits.'"
Jackson v. State, 562 So.2d 1373, 1383 (Ala. Cr.App.1990), quoting 23 C.J.S. Criminal Law § 907 (1989) (footnotes omitted).
"`[A] representation that the fact of cooperation will be made known to prosecuting authorities is insufficient to make a confession involuntary. United States v. Curtis, 562 F.2d 1153 (9th Cir. [1977]), cert. denied, 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978).' United States v. Prescott, 480 F.Supp. 554, 559 (W.D.Penn. 1979) (The defendant alleged that his oral statements were involuntary because his cooperation was induced by a promise that if he cooperated the F.B.I. Agents would tell the United States Attorney and it would go easier on him.) `[T]elling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government.' United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir.1978) (Defendant told that in return for her cooperation the government would make a recommendation and inform the court of her cooperation); United States v. Morris, 491 F.Supp. 226 (S.D.Ga.1980) (F.B.I. agents told defendant: `If you cooperate, it will go easy on you,' and further told him the possible penalties for armed robbery.) See also United States v. Hart, 619 F.2d 325 (4th Cir.1980); United States v. Jacks, 634 F.2d 390 (8th Cir.1980); United States v. Grant, 622 F.2d 308 (8th Cir.1980); Wallace v. State, 290 Ala. 201, 275 So.2d 634 (1973); Moss v. State, 347 So.2d 569 (Ala.Cr.App.1977); Tanner v. State, 57 Ala.App. 254, 327 So.2d 749 (1976)."
Bennett v. State, 409 So.2d 936, 940 (Ala.Cr. App.1981), cert. denied, 457 U.S. 1137, 102 S.Ct. 2968, 73 L.Ed.2d 1356 (1982).
*1114 In determining whether a statement was obtained by coercion or by improper inducement, all surrounding circumstances of the statement and the defendant must be examined in a totality of the circumstances analysis. Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967); Eakes v. State, 387 So.2d 855 (Ala.Cr.App.1978). "The true test of determining whether extrajudicial confessions are voluntary is whether the defendant's will was overborne at the time he confessed and therefore not the product of a rational intellect and a free will. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Elliott v. State, 338 So.2d 483 (Ala.Cr.App. 1976)." Eakes v. State, supra 387 So.2d at 859.
Thus, the attendant circumstances concerning both the making of the alleged inducement and the resulting statement, as well as characteristics of the individual defendant should be examined. The appellant in the present case was no stranger to the criminal justice system. The presentence report filed in this case, as well as the trial court's findings concerning the mitigating circumstance that the defendant has no significant history of prior criminal activity, indicates that the appellant had been arrested 10 years before the instant offense for burglary and theft, the year after that arrest he was arrested for stealing, eight and one-half years later was arrested for theft by shoplifting, and nine months thereafter was arrested on two counts of armed robbery and unlawful possession of a pistol, immediately following the instant offense.
"The factual inquiry centers on the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure. Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); Martin v. Wainwright, 770 F.2d 918 (11th Cir.1985); Jurek v. Estelle [623 F.2d 929 (5th Cir.1980) ]. The defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining his susceptibility to police pressures. Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Martin v. Wainwright."

Jackson v. State, 562 So.2d 1373, 1380-81 (Ala.Cr.App.1990) (the court noted that the appellant may have had an ulterior motive in making a statement in that, when he was arrested, the appellant "was in possession of the dead man's automobile, and he must have realized that it was only a matter of time before the body would be discovered and the investigation into the murder would focus fully and solely upon him"). "[T]he limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person incriminating himself. `What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal.' Martin v. Wainwright, 770 F.2d [918] at 926 (quoting Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953))." 562 So.2d at 1385. Similarly, in the present case, the appellant was apprehended in the dead man's automobile, with a number of the victim's possessions still in the car. The appellant had also left a trail in that he had pawned a number of the victim's items along his escape route. Thus, the appellant may have concluded that it would be in his best interest to disclose his involvement in the crime.
Through the testimony of the interrogating officer, it is clear that the promise was not viewed by him as a bargained-for condition of the appellant's statement. Moreover, the appellant did not raise this claim of involuntariness until appeal.[2] Therefore, although the failure to object does not preclude this court's review of the appellant's claim, it does weigh heavily against any claim of prejudice. Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). *1115 It is clear that, in order to be inadmissible, the officer's statement must have actually caused the appellant to confess. Jackson v. State, supra 562 So.2d at 1386.
"In other words, to be inadmissible under this rule, the confession must be so connected with the promise as to be the consequence of it. Conversely, a voluntary statement or confession made by defendant based upon his own conclusion that it would be in his best interest or work to his benefit does not render such statement or confession inadmissible."
23 C.J.S., supra at § 906 (footnotes omitted). See also Jackson v. State, supra at 1386. In the present case, an analysis of the totality of the circumstances indicates that the appellant's statement was not the consequence of the officer's promise to make known his cooperation to the court.
"... Even where there is credible testimony to the contrary, if the evidence as to the voluntariness of the confession is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge that the confession was voluntary need only be supported by substantial evidence and not to a moral certainty. When a conflict occurs in the evidence with respect to the voluntariness of a confession, great weight must be given to the judgment of the trial judge, and his finding of voluntariness will not be disturbed on appeal unless this Court is convinced that his conclusion is palpably contrary to the weight of the evidence. Thompson v. State, 347 So.2d 1371 (Ala.Cr.App.), cert. denied, Ex parte Thompson, 347 So.2d 1377 (Ala.1977)."
Bennett v. State, 409 So.2d at 939.
The trial court's conclusion that the statement was voluntary is not contrary to the weight of the evidence.

B
The appellant additionally argues that the State failed to meet its burden of proving the voluntariness of the appellant's statement and that it failed to demonstrate that the interrogating officers had not induced the statement through promise or coercion. The appellant argues that two officers interrogated him and a third officer was present intermittently during the interrogation; of these officers, he argues, only Officer Booth testified that he made no promises and engaged in no coercive activity to obtain the statement.
The record indicates that Lieutenant Booth testified that it appeared to him that the appellant gave his statement freely and voluntarily. Moreover, before trial, Lieutenant Booth gave testimony concerning the statement over the telephone. During cross-examination, the prosecutor asked him if he had promised anything or had used any threats of force or violence to secure the statement. Lieutenant Booth responded:
"No, sir, we didn't. There was no coercion, no threats, no promises of reward or hope for reward. Mr. Gaddy and I talked at great length about the other crimes. And we got to this one, we had kind ofhe had a feeling for how I did business, and I understood him. He wasI found him to be truthful, and I didn'tyou know, there was no promises made."
Thereafter, the witness stated that, in his opinion, the statement was given of the appellant's own free will and voluntarily.
This testimony by Lieutenant Booth was sufficient to meet the State's burden of proving that the statement was given without improper inducement by threat or promise. Moreover, the State introduced documentary evidence, including preambles to the appellant's statements that were signed by him and that acknowledged that he was not being threatened, coerced, nor promised anything in order to secure the statement, and that it was being voluntarily made. This was sufficient to meet the State's burden of proof.
"This court has held that the evidence was sufficient to show that a confession was voluntarily given where `[t]he officer who transcribed appellant's statement testified that it was voluntarily given and that it was read to and approved by appellant before appellant signed it.' Herron v. State, 409 So.2d 991, 992 (Ala.Cr.App. 1982). Further, `[t]his court has held that where the testimony of the officer shows that the appellant was read his rights, *1116 stated that he understood those rights and he was not being threatened, coerced, nor promised anything to secure this statement, indicated that he wanted to talk and made a recorded statement, this testimony was sufficient to sustain a finding that the appellant's statement was voluntary, even though the defendant contended that he was threatened. See Sales v. State, 432 So.2d 560 (Ala.Cr.App.1983).' Paulk v. State, 473 So.2d 666, 668 (Ala.Cr.App. 1985); Sumpter v. State, 480 So.2d 608, 613 (Ala.Cr.App.1985). Where the voluntariness predicate for the admission of the confession was presented through the testimony of the deputy who took the appellant's statement, this court held that the State overcame the presumption of involuntariness although the deputy could not remember some of the details of the confession. Alexander v. State, 370 So.2d 330-32 (Ala.Cr.App.), cert. denied, 370 So.2d 332 (Ala.1979). Also, where the officer's testimony was the only evidence of voluntariness and it directly contradicted the appellant's testimony, this court deferred to the finding of voluntariness by the trial court. Bryant v. State, 428 So.2d 641, 645 (Ala.Cr.App.1982), cert. denied, 428 So.2d 646 (Ala.1983). Where the appellant contended that the State did not adequately lay the predicate for a finding of voluntariness because the officer, whose testimony was the sole source of evidence, was not constantly present with the appellant during his statement, this court indicated that `[t]he State, "having established by the preliminary proof the voluntary nature of the confession, was not required... to array for interrogation every person who might have had access to or conversation with the prisoner during his incarceration in order to remove the prima facie presumption of involuntariness."' Johnson v. State, 453 So.2d 1323, 1326 (Ala.Cr. App.1984), quoting Logan v. State, 251 Ala. 441, 444, 37 So.2d 753, 755 (1948). For other cases wherein the officer's testimony was held sufficient to satisfy the State's predicate of voluntariness, see Gray v. State, 482 So.2d 1318, 1321 (Ala.Cr.App. 1985); Todd v. State, 472 So.2d 707 (Ala. Cr.App.1985); Webb v. State, 447 So.2d 864 (Ala.Cr.App.1984); Hadley v. State, 448 So.2d 465, 466-67 (Ala.Cr.App.1984); Hammins v. State, 439 So.2d 809, 811 (Ala. Cr.App.1983); Snider v. State, 422 So.2d 807 (Ala.Cr.App.1982)."
Griffin v. State, 500 So.2d 83, 90-91 (Ala.Cr. App.1986).

C
The appellant also alleges that, given the totality of the circumstances, his statement was involuntary because he has only a tenth-grade education, because on the night he made his statement, he had been arrested for having several open containers of alcohol in a motor vehicle, and because he had smoked crack cocaine that day. However, in general, an accused's educational background and intellect are factors to be considered by the factfinder in determining the weight and credibility to be given to the statement, not in determining the statement's admissibility.
"`"While an accused's intelligence and literacy are important factors to be considered in determining whether he intelligently and voluntarily waived his constitutional rights and made a confession, weak intellect or illiteracy alone will not render a confession inadmissible. Elrod v. State, 281 Ala. 331, 202 So.2d 539 [(1967)]; Twymon v. State, Ala.Cr. App., 358 So.2d 1072 [ (1978) ]; Arnold v. State, Ala.Cr.App., 348 So.2d 1092 [(1977)]." Hobbs v. State, 401 So.2d 276, 282 (Ala.Cr.App.1981).'

"Sasser v. State, 497 So.2d 1131, 1132 (Ala. Cr.App.1986)."
Smith v. State, 529 So.2d 1022, 1024 (Ala.Cr. App.1987). See also Jackson v. State, 562 So.2d 1373, 1381 (Ala.Cr.App.1990) (applying a totality of the circumstances analysis, this court found an accused to be sufficiently "street-wise" and "socially promoted," despite his tenth-grade education and his difficulty in reading).
The record indicates that the appellant was arrested in South Carolina when the officer saw open containers of alcohol in the vehicle, after a stop had been made. Following an inventory search of the vehicle, a crack pipe was also found. The officer who took the *1117 appellant's statement testified that no alcohol detection tests were performed on the appellant because the appellant was not driving the vehicle when it was stopped. The officer testified that the appellant did not appear to be under the influence of alcohol or any narcotic and that, before he took the appellant's statement, he asked the appellant whether he was under the influence of any narcotics or alcohol. The officer testified that the appellant indicated that he had had a beer and that he had been involved with drugs "for some period of time." However, the officer stated that the appellant appeared coherent and responsive and that he did not appear to be under the influence of drugs or alcohol.
In Jackson v. State, 674 So.2d 1318 (Ala.Cr.App.1993), affirmed as to conviction, reversed and remanded as to sentence, 674 So.2d 1365 (Ala.1994), the defendant, who had been convicted of capital murder, alleged that his statements were involuntary because he said he was intoxicated when he gave his first statement, which was given on the same day of his arrest. In that case, the defendant had been arrested for driving under the influence and the evidence clearly showed that the defendant had been drinking at a club. The interrogating officers testified that his eyes were bloodshot and that he was slumped over in his chair, but that they did not believe that he appeared to be under the influence, but rather appeared alert and coherent. Because there was no evidence that the appellant's intoxication had reached the stage of mania, this Court held that claim was simply a matter to be considered by the jury in determining the weight and credibility to be given the statement. This court stated:
"`"`[U]nless intoxication, in and of itself, so impairs the defendant's mind that he is "unconscious of the meaning of his words," the fact the defendant was intoxicated at the time he confessed is simply one factor to be considered when reviewing the totality of the circumstances surrounding the confession.' Carr v. State, 545 So.2d 820, 824 (Ala.Cr.App.1989). "The intoxicated condition of an accused when he makes a confession, unless it goes to the extent of mania, does not affect the admissibility and evidence of the confession, but may affect its weight and credibility.' Callahan v. State, 557 So.2d 1292, 1300 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala.1989)."

"`White v. State, 587 So.2d 1218 (Ala.Cr. App.1990).'

"State v. Austin, 596 So.2d 598, 601 (Ala. Cr.App.1991). See also Rheuark v. State, 601 So.2d 135, 138-39 (Ala.Cr.App.1992).
"`Indeed there was no evidence presented during the course of the trial that showed that the appellant was so intoxicated that he did not know what he was doing. In order for a confession to be inadmissible based on the appellant's intoxication, the "`mind of the appellant must be substantially impaired when the confession was made.'" Mann v. State, 581 So.2d 22 (Ala.Cr.App.1991), quoting Cross v. State, 536 So.2d 155 (Ala.Cr. App.1988). See also Hubbard [v. State, 500 So.2d 1204 (Ala.Cr.App.), aff'd, 500 So.2d 1231 (Ala.1986), cert. denied, 480 U.S. 940, 107 S.Ct. 1591, 94 L.Ed.2d 780 (1987) ]; McCammon v. State, 499 So.2d 811 (Ala.Cr.App.1986); Moore v. State, 488 So.2d 27 (Ala.Cr.App.1986); Palmer v. State, 401 So.2d 266 (Ala.Cr.App.), writ denied, 401 So.2d 270 (Ala.1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). "Where ample evidence ... exists from which the trial judge could conclude that the appellant was not intoxicated to the extent of mania, the admission of a confession for a jury's consideration is not an abuse of discretion." Hubbard v. State, 500 So.2d at 1218. The trial court's ruling was not `manifestly wrong.'

"Fuller v. State, 620 So.2d 669, 672 (Ala. Cr.App.1991), affirmed, 620 So.2d 675 (Ala. 1993)."
Jackson v. State, supra 674 So.2d at 1326. See also Fuller v. State, 620 So.2d 669 (Ala. Cr.App.1991), affirmed, 620 So.2d 675 (Ala. 1993); Harris v. State, 580 So.2d 33 (Ala.Cr. App.1990), cert. denied, 502 U.S. 840, 112 S.Ct. 127, 116 L.Ed.2d 95 (1991).
*1118 In the present case, the appellant's claims of lack of education and intoxication were both factors to be considered by the jury in determining the weight and credibility to be accorded to the appellant's statement.

II
The appellant argues that the trial court improperly precluded the jury from requesting that testimony given at trial be read back to it, even if the jury might have felt that this was necessary to assist in its deliberations. The statement to which the appellant refers was made by the trial court before jury deliberations. The entire comments were as follows:
"You will have your recollection of the evidence, as I said throughout. You will have these exhibits to help spark some of those recollections of the testimony. I have told you that the court reporter is not here to transcribe the testimony of a particular witness for you, so you go by what you recall. Some of you have taken notes, I think, and you can refer to your notes to refresh your recollection."
The appellant argues that the trial court's comment concerning the limited responsibility of the court reporter, specifically that his duty is not to transcribe the entire testimony of witnesses for use in jury deliberations, improperly denied the jury access to the trial court for legal instruction. See Ebens v. State, 518 So.2d 1264, 1268 (Ala.Cr. App.1986); Smith v. State, 57 Ala.App. 164, 326 So.2d 692, 694 (Cr.App.1975), cert. denied, 295 Ala. 419, 326 So.2d 695 (1976); Jenkins v. State, 51 Ala.App. 521, 287 So.2d 233 (1973). The appellant acknowledges that a trial court's decision to honor a specific request by a jury that portions of the transcript be read back to them is a matter within the discretion of the trial court; however, he argues that the general and blanket statement by the trial court in this case prohibited the jury from access to the trial court, no matter how crucial the need for refreshing the memory of its members might have been.
The record indicates, however, that the appellant failed to raise any objection to this statement; therefore, this matter must be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P. Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). In order for a claim to constitute plain error, an error must not only seriously affect the substantial rights of the appellant, but must have also had an unfair prejudicial impact on the jury's deliberations. Kuenzel v. State, supra 577 So.2d at 481-82. "`The plain error rule should be applied "solely in those circumstances in which a miscarriage of justice would otherwise result."'" (Citation omitted.)
The record indicates that the portion of the oral charge by the trial court which the appellant calls error was actually a repetition of the trial court's instructions to the jury following a witness's testimony and before dismissing the jurors for the day. The record indicates that, earlier in the trial, the trial court instructed the jurors as follows:
"Incidentally, you will have all of the exhibits that are admitted into court that will be in the jury room with you when you deliberate. So, there is no sense in trying to recall the details of the photographs, they are going into the jury room with you when you retire.
"I should mention this, that Walter [the court reporter] is not here to transcribe the written word for you to use during the deliberative stage of the trial. You will have to go by your collective recollection of the evidence as it is spoken. It is not his purpose to transcribe the testimony for the jurors. I just thought I would tell you that."
The record clearly indicates that the trial court, in making these statements, was not refusing to entertain requests by jurors for testimony to be read back to them; rather, the trial court was informing the jurors that they should not believe that they would have a transcript of all of the witnesses' testimonies for use in their deliberations. "[I]t is incumbent upon the trial judge to conduct an orderly trial and insure to the best of his ability that no misunderstanding of the testimony of the witnesses exists." *1119 Sanders v. State, 426 So.2d 497, 506 (Ala.Cr. App.1982) (trial court properly explained its reasons and its rulings during the cross-examination of a witness. Id. at 507). "`It is clearly the law that the jury "at all times has access to the trial court for legal instruction." Tillison v. State, 32 Ala.App. 397, 398, 27 So.2d 41, 42 [cert. denied, 248 Ala. 196, 27 So.2d 46 (1946) ]' Ebens v. State, 518 So.2d 1264, 1268 (Ala.Cr.App.1986)." Gordon v. State, 587 So.2d 427, 430 (Ala.Cr.App.1990), reversed on other grounds, 587 So.2d 434 (1991). This rule of law is generally cited in cases in which a reinstruction by the trial court to the jury is challenged on the ground that the reinstruction improperly emphasized that portion of the charge to the jury. As the appellant acknowledges, it is without question that the trial court is in the best position to determine whether to respond to jurors' questions at all.
In the present case, there was no question posed by the jury that was not answered by the trial court. The trial court was not restricting the jury from asking questions, rather it was fully informing them that they would not be provided with a transcript of the witnesses' testimonies, despite any appearance to the contrary based on the presence of the court reporter. There was no error by the trial court on this ground.

III
The appellant argues that he was denied his right to strike a petit jury from a panel of fairminded, impartial prospective jurors, because, he says, the trial court failed to remove from the venire a prospective juror who had indicated that he could not be fair in any case in which drugs were involved. The appellant argues that the trial court should have removed the juror sua sponte, but at no time did the appellant object to the trial court's failure to do so. Moreover, the appellant did not challenge the potential juror for cause, although he did challenge a number of prospective jurors for cause. Thus, this claim must be reviewed pursuant to the plain error doctrine. Rule 45A, Ala. R.App.P. The record indicates that this potential juror did not sit on the petit jury; the prosecutor struck him using a peremptory strike.
Following the voir dire examination of the jury venire, a number of prospective jurors were individually questioned in the trial judge's chambers. The potential juror at issue was questioned as follows:
"QUESTIONS BY THE COURT:
"Q. Do you remember reading something about the case, sir?
"A. Yes, I read about it.
"Q. Do you recall any details about what you read?
"A. No, sir, that's just all, I just remember reading about it and that was all. And another thing he brought up about this drug problem.
"Q. Oh, yes.
"A. You know, I have my doubts about that too, because
"Q. Well, we all have feelings about the drugs.
"A. Yes.
"Q. The question would be, sir, if there is evidence of drugs in the caseI don't say that there will bebut, if there is, would that somehow impair you from being a fair juror? Could you not make your verdict based on the evidence?
"A. I believe I will. I will give you my reasons for believing it. I have done everything, me and my wife, under my power, I have a daughter that's a crack addict. I put her in these places and things and it still does no good. I spent all of my money trying to get herand told me last week that she was out selling it, too. But, anyway, she will come to my house and stay two or three days, four days, then gone again and don't see her no more for two or three months.
"Q. How old is your daughter?
"A. Twenty-six years old.
"Q. Twenty-six?
"A. Twenty-six last month.
"Q. We all wish you the best of luck with that.
"A. And that's why I said, I doubt it, if that should come up.

*1120 "Q. I'm not doing any good either, up here, as a judge, telling people what to do. I'm not doing any good on the dope.
"A. And, then, I wouldn't want to stay overnight anyway. I have to open and close the school every day.
"Q. Which school?
"A. McArthur Elementary School.
"Q. Is there not somebody that could substitute for you when you are sick? What do they do when you are sick or do you ever get sick?
"A. I get sick, I'm on disability now.
"Q. But you just go to school anyway?
"A. Yes.
"Q. No way to get a back-up out there, sir?
"A. Yeah, somebody could open it up.
"THE COURT: Anybody want to ask Mr. Smith a question?
"[PROSECUTOR]: No.
"THE COURT: [DEFENSE COUNSEL]
"[DEFENSE COUNSEL]: No.
"THE COURT: Thank you. I think it is wise we talk privately so that we can better understand your feelings. Good luck with your daughter."
The appellant cites Hunter v. State, 585 So.2d 220 (Ala.Cr.App.1991), in support of his argument. However, the factual circumstances of Hunter are distinguishable from those in the instant case. In Hunter, the trial court improperly denied the defendant's challenge for cause of a prospective juror and forced the defendant to exercise one of his peremptory challenges in order to remove the potential juror. In the instant case, the appellant did not challenge the potential juror for cause, nor did he have to exercise a peremptory challenge in order to remove the prospective juror. Therefore, the appellant suffered no prejudice by the trial court's failure to remove the potential juror sua sponte. See Smith v. State, 581 So.2d 497, 503-04 (Ala.Cr.App.1990), reversed on other grounds, 581 So.2d 531 (Ala.1991) (wherein this court found that the trial court's failure to remove sua sponte two prospective jurors was not plain error, because the appellant failed to show that he was biased or prejudiced.)

IV
The appellant argues that the trial court's failure to instruct the jury that it could reject the appellant's statement as involuntary was improper and violated the appellant's constitutional rights. The record indicates that the trial court charged the jury as follows:
"THE COURT: All right. With regard to the statements, folks, as reflected in the exhibit numbers the court reporter gave you, consider all of the facts and circumstances surrounding the taking of the alleged confession or statement in determining the weight or credibility which you give to this statement. In exercising your exclusive prerogative or determining credibility of the evidence or the weight to which it is properly entitled, you may consider the circumstances under which the statement was obtained, including the situation and mutual relation of the parties. While I determine the voluntariness of the statement and thus you are allowed to hear it, the jury determines the weight or credibility and may disregard the defendant's statements which you deem to be unworthy of belief or in which you entertain a reasonable doubt as to its truth."
The record indicates that the appellant failed to object on this ground at trial and, therefore, this issue must be analyzed pursuant to the plain error doctrine. Rule 45A, Ala.R.App.P. Although the appellant cites Bush v. State, 523 So.2d 538 (Ala.Cr.App. 1988), to support his argument that the trial court's instructions constituted plain error, that case is distinguishable from the instant case. In Bush v. State, supra at 557-560, this court held that the trial court's instructions to the jury, concerning its finding as to the voluntariness of the defendant's statement, constituted reversible error for the following reasons:
"The court instructed the jury that it had found that the confession `was not improperly induced' and that the jury could not disregard its admission. It further instructed the jury that the court had found *1121 the confession voluntary and that the jury could not disregard that finding. The court stated, `You are not to determine whether the Court's action in finding that it was voluntary is correct or not.' In our opinion, the instructions, taken as a whole, were incorrect as a matter of law, for they violated the rule of [Ex parte ] Singleton, [465 So.2d 443 (Ala.1985) ], set out above. They had the effect of taking from the jury its ultimate responsibility of determining the voluntariness of the confessions."
Id. 523 So.2d at 559-60.
In Bush v. State, supra at 560, this court held that the issue relating to the error was preserved, but further noted "for the sake of argument" that such an error in that case would have constituted plain error. The reason for that decision was stated as follows:
"In the instant case, appellant was entitled, as a matter of right, to have the jury instructed that the jury had the responsibility to consider the voluntariness of the confessions as the voluntariness affected the weight or credibility of the confessions. The jury was not given those instructions, but was told that it was not to determine whether the court's action in finding the confession voluntary was correct or not. Thus, a substantial right of appellant was denied. The error is so obvious that failure to note it would seriously affect the fairness and integrity of the proceedings."
Id. at 560.
In the present case, the trial court did not take away the jury's function in determining voluntariness. The trial court informed the jury that, although the trial court initially determines the voluntariness of the statement, the jury determines its weight or credibility, by considering all of the facts and circumstances surrounding the taking of the confession, and the jury may totally disregard any of the appellant's statements that the jury deems "unworthy of belief or in which [the jury] entertains[s] a reasonable doubt as to its truth."
Similarly, in Jackson v. State, 674 So.2d 1318 (Ala.Cr.App.1993), affirmed as to conviction, reversed and remanded as to sentencing, 674 So.2d 1365 (Ala.1994), an instruction conveying the same information as that of the instant case was held not to constitute plain error. In so holding, this court stated:
"In Ex parte Singleton, 465 So.2d 443, 446 (Ala.1985), the Alabama Supreme Court addressed this issue, stating:
"`It is improper for a trial judge to disclose to the jury that he made a preliminary determination that a confession was voluntary and therefore admissible. Clifton v. United States, 371 F.2d 354 (D.C.Cir.1966), cert. denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967); United States v. Inman, 352 F.2d 954 (4th Cir.1965). In the case at hand, however, the trial judge made it clear to the jury that they were to ultimately determine whether the confession was voluntary. We agree, therefore, with the Court of Criminal Appeals that there was no prejudicial error, since the comments of the trial judge "did not imply that the jury should accept and believe appellant's confession based on the trial court's ruling that the statement was voluntary."
"`....
"`Correctly stated, whether a confession was voluntary rests initially with the trial court; once the trial court makes the preliminary determination that the confession was voluntary, it then becomes admissible into evidence. Thereafter the jury makes the determination of voluntariness as affecting the weight and credibility to be given the confession. Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976).'
"....
"This court has previously addressed this issue in a similar situation where the trial court orally instructed the jury that, while the trial court determines the voluntariness of a defendant's statement, the jury has the exclusive prerogative of determining the credibility of the evidence or the weight to be accorded the evidence, so that the jury may disregard any of the statement that it considers to be unworthy of belief. Clark v. State, 621 So.2d 309 [, 324-25] (Ala.Cr.App.1992). See also Aultman *1122 v. State, 621 So.2d 353 (Ala.Cr.App. 1992) (no prejudicial error occurred where the trial court instructed the jury that it had found the confession to be voluntary, because the court also instructed the jury that it was to determine how much weight, if any, to give the confession.) In Clark v. State, 621 So.2d at 325, this court held:
"`In the present case, as in Ex parte Singleton, the trial court's charge, when read as a whole, did not indicate that the jury should believe the appellant's confession because the trial court had determined it to be voluntary; nor did it indicate that the jury had no role in determining its voluntariness. Rather, the trial court's instructions informed the jury of its role in determining what weight should be given the confession.'
674 So.2d at 1325. See also Ready v. State, 574 So.2d 894, 900 (Ala.Cr.App.1990) ("Because the trial court clearly informed the jury that they were to make the ultimate determination as to whether the confession was voluntary, any error in the trial court's statements was harmless.")
The trial court's instructions did not misinform the jury of the law, did not affect the appellant's substantial rights, did not constitute prejudicial error, and, therefore, did not rise to the level of plain error.

V
The appellant argues that the prosecutor's "pervasive and repeated misconduct" in his closing arguments to the jury during the guilt phase violated the appellant's constitutional rights. Specifically, the appellant argues that the prosecutor, during his closing argument at the guilt phase, argued facts not in evidence, shifted the burden of proof to the defense, and relied on his authority as a government agent.

A
The appellant argues that the prosecutor improperly shifted the burden of proof to the defendant during his closing argument by way of three comments: one implying that the defendant had an obligation to call certain witnesses on his own behalf; one implying that the defendant is under an obligation to reveal what his defense at trial will be; and one implying that he had an obligation to testify at trial. These specific comments cited by the appellant are as follows:
"[T]hey [the appellant and the victim] went to Krispy Kreme. Don't you remember the testimony about that, that seemed to be one of the favorite places the defendant hung out, right?
"... Don't you think this picture hadn't been shown there or at Shoney's? Where are those people if he was such a regular customer of Krispy Kreme and was so well known there? Don't you think somebody there would have remembered his coming, if someone else had recognized him? Where are those people? They have subpoena powers just like we do. Where are they? They aren't here."
"Did he ever say anything different from this when he had a chance to talk to Sergeant Duncan? Did he ever say self-defense? Did he ever tell Sergeant Duncan this man had the knife out and I got nervous?"
"He hollered self-defense, he never cried self-defense to Sergeant Chapman or Lieutenant Booth and he never talked about self-defense to Sergeant Duncan when Sergeant Duncan when up there and wanted to see him.
"And that has been almost a year ago, ladies and gentlemen.... He has had a year to claim self-defense. When have we heard it for the first time? Today."
No objection was made by the appellant to any of these statements by the prosecutor; therefore, in order to require reversal, the comments must rise to the level of plain error. Rule 45A, Ala.R.App.P. "`[P]lain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings.' United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933, 107 S.Ct. 407, 93 *1123 L.Ed.2d 359 (1986)." Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990).
When these comments are examined in light of the entire record, it is clear that the prosecutor's purpose in making these statements was to comment on evidence in this case and to draw legitimate inferences therefrom; specifically, to point out the weaknesses in the appellant's theory of the case, as established by the appellant's testimony. His trial version of the facts differed considerably from the facts he recounted in his earlier pretrial statements. At trial, the appellant testified that he had been involved in a long-term relationship with the victim, which involved sporadic homosexual encounters. He indicated that the victim would pay him and provide him with food and board in return for sex. The appellant testified that on several occasions beginning in July 1989 he spent time with the victim. He testified that the appellant made sexual advances toward younger boys in his presence and that the appellant became disgusted by the victim. The appellant's rendition of the facts at trial explained the murder as an act of self-defense, as the appellant attempted to thwart the victim's advances. On cross-examination, the prosecutor questioned the appellant as to why he had never explained the murder this way to the authorities previously, and the appellant responded that he did not want to be considered a homosexual, especially if he were to go to prison.
The record clearly indicates that the prosecutor was attempting to discredit the appellant's trial testimony. In order to view these excerpts in the context of the entire closing argument, it is necessary to consider the following comments by the prosecutor:
"You are going to have this back there with you, this is the statement.... According to Lieutenant Booth this is his verbatim statement.
"He comes into court today, when everything is on the line and says, `No, that's not what I said, Lieutenant Booth put the words into my mouth. No, I'm not worried about murder, but I am worried about my reputation as a homosexual.'
"... What else was elicited.... They were at Shoney's, they went some place else to eat, I don't recall the name of it, but they went to Krispy Kreme. Don't you remember the testimony about that, that seemed to be one of the favorite places that the victim hung out, right?
"The defendant himself mentioned that himself several times in regard to Mr. Caldwell, Krispy Kreme, Krispy Kreme.
"Don't you think this picture hadn't been shown there or at Shoney's? Where are those people, if he was such a regular customer of Krispy Kreme and was known so well there? Don't you think somebody there would have remembered him coming in, if somebody else had recognized him? Where are those people? They have subpoena powers just like we do. Where are they? They aren't here.
"I am not going to stand up here and call that young lady a liar, but I am going to tell you this, she was mistaken as far as this man being there.
"What did she tell Sergeant Duncan? `He [the victim] usually had visitors, usually two at a time. They came late at night and stayed for a few minutes.'
"What else? She said they came in big trucks, usually, because they parked them across the street. She didn't mention two at a time. Her testimony is totally different now than it was when she told Sergeant Duncan, right after this happened.
"And coincidentally, with the defendant sitting here listening to her testify, the month that he says he was in town, just coincidentally, happened to be the month that she sat up there and said she might have seen him or did see him, looking at the photographs, in October or maybe September. He testified the same thing exactly. Coincidentally? He wasn't here, ladies and gentlemen, he wasn't here.
"Did he say anything different from this when he had a chance to talk to Sergeant Duncan? Did he ever say self-defense? Did he ever tell Sergeant Duncan this man had the knife out and I got nervous? You heard his testimony. And it is certainly not pleasant, `But I had my privates out and he was stroking it and he pulled my *1124 sheath knife out that I had on my side and I got a little worried about that.' So, then he goes to try to get the knife from the victim, he is turning it on Caldwell now that supposedly was making some kind of homosexual advance and sitting there with a knife in his hand. When in his statement he said, `He moved towards him and pulled the knife out of his backpulled the knife out of the back of his pants.'
"He has turned this whole thing around and is putting the heat on the victim. It's the victim's fault. This was self-defense.
"Are eleven wounds to the throat self-defense? Five other wounds to his chest. Look at the photographs, one of them is in his side, upper part of the chest on the side. Are they self-defense?
"Do you recall the testimony about the two incised wounds, one in the victim's hand and one on the victim's foot? Do you think there is something strange with that victim's foot? Do you wonder how he got it on his foot, when that was the only wound on his foot?
"Let me tell you how. He was laying down. I can't lay down in this chair, but he was laying down. His own statement says, `When I pulled that knife out and came towards him, he tried to sit up.' ...
"....
"If it was self-defense, why not get him into unconsciousness and go out the door and call the police and say, `I've just been attacked. This man came at me with a knife.'
"Did he do that? Has there ever been an ounce of testimony about that? No, no, there hasn't.
"But, you heard him say what he did, he let him lay there for a while and then left and did little things like turn the lights off and lock the doors so he wouldn't be seen. That's what he did. Self-defense? He never hollered self-defense, he never cried self-defense to Sergeant Chapman or Lieutenant Booth and he never talked about self-defense to Sergeant Duncan when Sergeant Duncan went up there and wanted to see him.
"And that has been almost a year ago, ladies and gentlemen. The date December 5, the man was last seen on [December 8]. According to the statement he was killed on [December 9], almost a year ago. He has had a year. He has had a year to claim self-defense. When have we heard it for the first time? Today."
While the appellant is correct that he is under no obligation to testify, that fact is inapplicable to the prosecutor's comments, because they were made in closing after the appellant had, in fact, testified. A prosecutor is allowed to comment on the evidence presented. Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994). Moreover, while the appellant is under no obligation to present witnesses, the prosecutor could properly comment on evidence that would presumably have been presented by a defendant to substantiate his defense, if the defendant testifies in his own behalf. Farley v. State, 406 So.2d 1045, 1050 (Ala.Cr.App.), writ denied, 406 So.2d 1050 (Ala.1981).
"While the burden of proof never shifts in a criminal case, Ragland v. State, 238 Ala. 587, 192 So. 498 (1939), a prosecutor may comment on the failure of the defendant, who testifies in his own behalf, to produce evidence which would presumably aid him or substantiate his alibi if it were true. Henry v. State, 355 So.2d 411 (Ala. Cr.App.1978); Holloway v. State, 19 Ala. App. 371, 97 So. 376 (1923).
"`In Alabama a defendant is not required to notify the state of an alibi defense. Therefore, in most cases the state has no way of knowing which witnesses would or could testify as to the whereabouts of the accused at the time of the offense in establishing an alibi defense. Indeed, generally the state would not even know of the existence of the alibi defense until such testimony came from the witness stand. Therefore, since the appellant was in a superior position to know of the existence and identity of his alibi witnesses it was not error for the state to comment upon his failure to produce other witnesses whose testimony would presumably aid the appellant or substantiate his story if the story were true. The prosecutor's comments *1125 were only a reasonable inference and deduction from the evidence....'
"`Henry, 355 So.2d at 414....
"....
"Even though the `burden of proof' never shifts in a criminal case, the defendant does have the `burden' of producing evidence of his alibi. Ragland, supra."

Id. 406 So.2d at 1050. See also Smith v. State, 588 So.2d 561 (Ala.Cr.App.1991) (this court held that a prosecutor's comment to the jury that "[witnesses] can answer questions just like we can ... you can get them a subpoena and bring them up here and ask them what they know about it," was proper despite the appellant's argument that the prosecutor had improperly insinuated that the defense had a responsibility to produce certain evidence; id. at 571).
Although the appellant argues that the prosecutor's comments indicated that he acted improperly in not revealing what his defense at trial would be, the comments were informing the jury that the appellant had not raised his self-defense theory until trial, a fact that was in evidence, and, therefore, the prosecutor was drawing an inference from that evidence to the effect that the appellant's theory was not worthy of belief. See Smith v. State, 588 So.2d at 570 (prosecutor's statement that the appellant "lay pretty much everything on [an accomplice] ... that's not an unusual thing for a person to dowhen they have committed a criminal offense and they committed that offense along with another person. It's quite common to tell that story in the light most favorable to themselves, nothing whatsoever unusual about that," was proper as his inference drawn from the evidence).
The record indicates that the trial court repeatedly instructed the jury that the burden of proof was on the State rather than on the appellant, and none of the cited comments by the prosecutor indicated otherwise. The trial court also instructed the jury on a number of occasions that the attorney's arguments did not constitute evidence.

B
The appellant argues that a number of comments by the prosecutor addressed facts not in evidence and were intended solely to inflame the jury. The appellant cites the following argument by the prosecutor:
"The defense lawyer says why blame me because we didn't raise self-defense? Well, you can bet your bottom dollar, ladies and gentlemen, that in the year that has passed since this case has come about and this charge has been pending, that if at one moment the defendant had told his lawyer this was self-defense, they would have been over to the Police Department screaming, `Hey, we have got more leads'
"[Defense counsel]: Of course, I would object to that. I'm going to make a motion for a mistrial. That is not correct, that is absolutely not correct. It is meant to inflame this jury. And I make a motion for mistrial.
"THE COURT: Well, I am letting you make a narrative objection, sir. Of course, I am not going to grant a mistrial. What a lawyer might do under certain circumstances, folks, is entirely speculative and probably is not a proper subject for comment by the district attorney. So I sustain the objection. Let's move along to another subject.
"[PROSECUTOR]: The defendant at any time could have raised that issue, at any time. And if it had been self-defense, we wouldn't be here today, if self-defense had been found in this investigation at any time. We heard it today."
These statements by the prosecutor occurred during his rebuttal argument and closing to the jury during the guilt phase. They were made in response to an argument made by defense counsel during his closing statement to the jury, in which he implied that the reason the appellant had not previously raised his defense of self-defense was that the Alabama authorities had been instructed not to take a subsequent statement from the appellant. Defense counsel thereafter indicated that this instruction came from the district attorney. He also argued that the appellant waited to come forward with *1126 this claim, because he wanted to wait for the jury to hear his case. Thus, these comments by the prosecutor were a reply-in-kind to defense counsel's argument that the reason the theory of self-defense was not previously raised was that the State was preventing the appellant from raising this defense before trial. "When the prosecutor's statements are viewed in the proper context, we conclude that they were permissible responses to comments made by the defendants' counsel during closing argument. See Stephens [v. State, 580 So.2d 11 (Ala.Cr.App.1990), affirmed, 580 So.2d 26 (Ala.1991) ]; Merritt v. State, 571 So.2d 409 (Ala.Crim.App.1990)." Ex parte Musgrove, 638 So.2d 1360, 1368 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994). See also Brown v. State, 686 So.2d 385 (Ala.Cr.App. 1995).
Furthermore, the trial court sustained the objection and gave curative instructions to the jury concerning the aspect of the prosecutor's comment that speculated about the defense counsel's failure to raise the theory of self-defense earlier. "[I]t is fundamental that the trial judge, who is in the best position to determine when closing arguments are prejudicial and what curative measures are called for, is given wide discretion. Hurst v. State, 397 So.2d 203 (Ala.Cr. App.), cert. denied, 397 So.2d 208 (Ala.1981)." Nelson v. State, 452 So.2d 1367, 1370 (Ala.Cr. App.1984). It is clear that most prosecutorial arguments made during closing, even if improper, may have any prejudicial effect remedied and eradicated by prompt, swift, and thorough curative instructions by the trial court. Rutledge v. State, 482 So.2d 1250, 1257 (Ala.Cr.App.1983), reversed on other grounds, 482 So.2d 1262 (Ala.1984), citing Maness v. State, 57 Ala.App. 431, 329 So.2d 120, cert. denied, 295 Ala. 411, 329 So.2d 126 (1976); Vice v. State, 32 Ala.App. 59, 22 So.2d 107, cert. denied, 246 Ala. 672, 22 So.2d 110 (1945). See also Daniels v. State, 650 So.2d 544 (Ala.Cr.App.1994), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995) (where the prosecutor referred to the fact that the appellant had spent over a year in jail for the offense without ever telling the police about his alibi witnesses this court found no error, because the trial court sustained the objection and gave curative instructions to the jury.)
The appellant suffered no prejudice due to these comments by the prosecutor in his closing argument during the guilt phase, especially in light of the trial court's curative instructions.

C
The appellant further argues that the prosecutor improperly relied on his authority as a government agent in an effort to lead the jury to believe that the government had already determined that the self-defense claim was not credible, and that the government was more qualified to make such a determination than was the jury. The appellant cites Guthrie v. State, 616 So.2d 914 (Ala.Cr.App.1993), in support of his argument. The comment the appellant cites as improper was made by the prosecutor during his closing. The prosecutor said, "[T]he State of Alabama and the people of this county and [the victim's] family are asking you to return a verdict of guilty as charged of capital murder." The appellant argues that when this statement is "coupled" with the prosecutor's argument raising facts not in evidence to rebut the defense claim of self-defense, see part V-B of this opinion, the argument constitutes reversible error.
The record indicates that the appellant did not object to this comment made by the prosecutor and, therefore, it must rise to the level of plain error in order to warrant a reversal. Rule 45A, Ala.R.App.P. In Guthrie v. State, 616 So.2d 914, 931-32 (Ala.Cr. App.1993), this court held to be plain error the following comment by a prosecutor during closing argument at the sentencing phase of the trial: "When I first became involved in this case, from the very day, the State of Alabama, the law enforcement agencies and everybody agreed that this was a death penalty case, and we still stand on that position." In holding that this comment constituted plain error, this court opined:
"The comment can reasonably be interpreted as an effort to lead the jury to believe that the whole governmental establishment had already determined that the sentence should be death and to invite the *1127 jury to adopt the conclusion of others, ostensibly more qualified to make the determination, rather than deciding on its own. We see this as a clear infringement upon the jury's important and critical discretion in determining whether to recommend a sentence of death or of life imprisonment without parole. For a discussion of this type of argument, which is commonly referred to as the `prosecutorial expertise argument,' in the sentencing phase of death penalty cases, see Brooks v. Kemp, 762 F.2d 1383 (11th Cir.1985), vacated on other grounds, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), reinstated, 809 F.2d 700 (11th Cir.1987), and cases cited therein.
"`Because the jury is empowered to exercise its discretion in determining punishment, it is wrong for the prosecutor to undermine that discretion by implying that he, or another high authority, has already made the careful decision required. This kind of abuse unfairly plays upon the jury's susceptibility to credit the prosecutor's viewpoint.'

"Id. 762 F.2d at 1410."
Guthrie v. State, supra 616 So.2d at 932.
The present case differs from the situation addressed in Guthrie v. State, supra, in that this comment was made during the closing argument at the guilt phase, rather than the sentencing phase. Moreover, the prosecutor's comment in the present case differs from that in Guthrie, in that in this case the prosecutor was simply making a request for a guilty verdict. The other comments by the prosecutor, concerning the appellant's theory of self-defense, were comments based on the evidence and proper inferences drawn therefromspecifically, that the appellant was raising this defense for the first time at trial and therefore the prosecutor was casting doubt on its veracity. See part V-A of this opinion.
"It is both the duty and the right of counsel to present the case of his client, whether it be the state or a defendant, as fully and forcibly as the evidence, its tendencies and the inferences therefrom may justify. Within these limits, the widest range of discussions should be accorded. Childress v. State, 86 Ala. 77, 5 So. 775 [(1889)].
"`The rule in this state is well established and has been often cited. It is as follows: "The statement must be made as of fact; the fact stated must be unsupported by any evidence, must be pertinent to the issue, or its natural tendency must be to influence the finding of the jury ..." This is the law as stated in Cross v. State, 68 Ala. 476 [ (1881) ]. This rule was then elucidated for us in other language found in the Cross case when the court said, "Every fact the testimony tends to prove, every inference counsel may think arises out of the testimony, the credibility of the witnesses, as shown by their manner, the reasonableness of their story, their intelligence, means of knowledge, and many other considerations, are legitimate subjects of criticism and discussion. So, the conduct of the accused, his conversation (if in evidence), may be made the predicate of inferences, favorable or unfavorable.'"
Edson v. State, 53 Ala.App. 460, 301 So.2d 226 (1974).
Similarly, in Smith v. State, 588 So.2d 561, 569 (Ala.Cr.App.1991), the appellant argued that the prosecutor and the assistant prosecutor had emphasized their roles as representatives of the State in their opening remarks to the jury. The appellant noted that the prosecutors had referred to the fact that they represented the State. This court found no error in the prosecutor's comment, citing Gallant v. State, 167 Ala. 60, 63, 52 So. 739, 741 (1910), wherein the Alabama Supreme Court held that a prosecutor's statement during closing argument explaining his duty as a prosecutor and his relation as such to organized society was not error. Thus, the prosecutor's comment in the present case did not constitute plain error.

VI
The appellant argues that his constitutional rights were violated in that the record does not affirmatively reflect that he was present during arraignment, during supplemental jury instructions, and during a hearing held pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *1128 The appellant does not argue that he was not present during these times, rather he argues that the record does not properly reflect his presence. Because the appellant has not previously raised this matter, his claim must be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
The record clearly indicates that the appellant was present during arraignment:
"THE COURT: Mr. Court Reporter, this is the State v. Richard Eugene Gaddy. Mr. Gaddy back from South Carolina. This is a capital murder case set for trial on December 3. Don Russell, will you arraign Mr. Gaddy?
"MR. RUSSELL: Do you have the circuit court number?
"THE COURT: Yes. XX-XXXXXX.
"MR. RUSSELL: `The State of Alabama, Jefferson County, the grand jury of said county charge that, before the finding of this indictment, Richard Eugene Gaddy, whose name is to the grand jury otherwise unknown, did intentionally cause the death of James A. Caldwell, by stabbing him with a knife, and Richard Eugene Gaddy caused said death during the time that he was in the course of committing a theft of assorted keys, a ring, a wallet, a stamp collection and an automobile, the property of James A. Caldwell, by the use of force against the person of James A. Caldwell, with intent to overcome his physical resistance or physical power of resistance, while the said Richard Eugene Gaddy, was armed with a deadly weapon, or dangerous instrument, to wit: A knife, in violation of Section 13A-5-40(a)(2) of the Alabama Criminal Code, against the peace and dignity of the State of Alabama.' Signed, `David Barber, District Attorney, Tenth Judicial Circuit.' How do you plead?
"[Defense Counsel]: Not guilty.
"THE COURT: All right, sir. If you want to see him, [Defense Counsel], in the jury room, you are welcome to.
"Proceedings concluded."
Thus, despite the appellant's claim to the contrary, the record implies that the appellant was present during arraignment by the trial court's request that the appellant be arraigned and Mr. Russell's question, "How do you plead?" Moreover, the case action summary sheet contained in the record states as follows: "10-16-90-Def. Arraigned in open court by DDA Russell, [Defense Counsel] present."
The appellant argues that the record also does not affirmatively show that he was present during supplemental jury instructions; the appellant does not contend that he was not present, but rather argues that the record does clearly show that he was present. Because no objection was made before this appeal on this ground, this matter is not reviewable in the absence of plain error. Rule 45A, Ala.R.App.P. There is no indication in the record that the appellant was not present during the supplemental instructions. However, the appellant argues that the record must specifically state that he was present during every stage of the proceedings.
It is clear that, according to Rule 9.1, Ala.R.Crim.P., "[t]he defendant has the right to be present at the arraignment and every stage of the trial, including the selection of the jury, the giving of additional instructions pursuant to Rule 21, the return of the verdict and sentencing." Moreover, in a capital case, a defendant's right to be present cannot be waived. Ex parte DeBruce, 651 So.2d 624 (Ala.1994) (wherein the Alabama Supreme Court held that a capital defendant's absence during a pretrial hearing did not constitute reversible error). However, it is not necessary that the record continually reflect a defendant's presence. In Alabama, records involving felony cases must show that the defendant was personally present with counsel at arraignment and before passing sentence, when the court holds the allocution with the defendant. "These being shown, unless the contrary appears, it is assumed that the defendant was continuously present at all stages of the trial." Pike v. State, 47 Ala.App. 161, 251 So.2d 779, 780 (1971) (and cases cited therein.)
"In 16 Corpus Juris [§ 2066]...., at page 814, it is further stated, however, that `as a general rule the presence of the defendant during a trial for felony must appear from the record, and generally such presence cannot be presumed, but if the *1129 record shows defendant's presence at the commencement, or at any other stage of the trial, his presence during subsequent stages thereof will be presumed, in the absence of evidence to the contrary.'
"The record proper in the case, now under consideration, shows affirmatively the personal presence, in open court, of the defendant and his attorney, when the defendant was arraigned upon the indictment and pleaded thereto, when the day was set for his trial, viz., March 16, 1931, when the venire was drawn and allowed for his trial, and when all other orders preliminary to his trial were made. It also affirmatively shows that the defendant was present in person when the sentence of death was pronounced upon him. Counsel for defendant has made no claim here that the defendant was not present in open court from the commencement to the conclusion of the trial. A bill of exceptions appears in this case, and this bill of exceptions, if we are permitted to look to it, shows the presence of defendant during trial, as many exceptions appear therein to have been reserved by the defendant on the trial.
"From the fact that the defendant is shown to have been personally present, attended by counsel, at his arraignment upon the indictment, and from the further fact that the record proper affirmatively shows the personal presence of the defendant when sentence upon him was pronounced by the court, may we not draw a fair inference that he was also personally present at the other successive stages of his trial, and at the time the verdict was returned into court? We are of the opinion, and so conclude, that such facts amply warrant the inference that the defendant was present at each successive stage of his trial. In so holding, we are supported directly by the decision in the case of Dix v. State, 147 Ala. 70, 41 So. 924, 926. In the Dix Case, Judge Denson, who, prior to his election to court, was a trial judge for many years, says: `The recitals of the minute entry of his personal presence at the arraignment on the 11th, and that the trial was continued from day to day and from time to time, and of his personal presence when sentence was pronounced, and that he said nothing why sentence should not be pronounced, are sufficient to warrant the conclusion that the record by necessary and reasonable implication shows the personal presence of the prisoner during the entire sitting of the court from the arraignment to the rendition of the verdict. * * * Young's Case, 39 Ala. 357; Snow's Case, 58 Ala. 372; Banks & Wood v. State, 72 Ala. 522; Lovett's Case, 29 Fla. 356, 11 So. 172; Irvin's Case, 19 Fla. 872; Palmquist's Case, 30 Fla. 73, 11 So. 521; Stephens' Case, 19 N.Y. 549; West's Case, 22 N.J.Law 212; Dodge's Case, 4 Neb. 220; Peters' Case, 94 F. 127, 36 C.C.A. 105; Jeffries' Case, 12 Allen (Mass.) 145; Rhodes's Case, 23 Ind. 24; Schirmer's Case, 33 Ill. 276; State v. Langford, 44 N.C. 436; State v. Wood, 17 Iowa 18.'
In the more recent case of Cosby v. State, 202 Ala. 419, 80 So. 803, it is said: `It is suggested that the evidence failed to show the presence of the defendant in court at the several stages of the proceedings now witnessed by the full judgment entry. The docket entries, or the judge's bench notes, as they are commonly called, showed affirmatively the presence of the defendant at the arraignment. They also show by necessary inference that defendant was present at the trial, and the judgment nunc pro tunc and sentence recites his presence in court when that judgment and sentence was pronounced by the court. Repeated recitals of the fact of defendant's presence was pronounced by the court. Repeated recitals of the fact of defendant's presence in court are not necessary. The record and quasi record evidence stated above afforded sufficient basis for the judgment and sentence nunc pro tunc. Dix v. State, 147 Ala. 70, 41 So. 924.'"
Frost v. State, 225 Ala. 232, 236, 142 So. 427 (1932).
In the present case, the record indicates that the appellant was present throughout the trial. The record affirmatively shows that the appellant was present at a pre-trial conference on various motions, was present during the trial court's qualification of the *1130 venire panel, was present during the individual voir dire of the venire, was present at the hearing on his motion to suppress his statements, was present at the beginning of trial, was present on the day he testified at trial, was present when the jury read the verdict and, as previously stated in this issue, was present during arraignment. These affirmative showings, where there is no indication to the contrary apparent of record, indicate that the appellant was present during all of the proceedings.
"`[T]his court cannot predicate error on matters not shown by the record, nor can we presume error from a silent record.' Smelcher v. State, 520 So.2d 229 (Ala.Cr. App.1987); Abbott v. State, 494 So.2d 789 (Ala.Cr.App.1986). `Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done.' Jolly v. State, 405 So.2d 76 (Ala.Cr.App.1981); Watson v. State, 398 So.2d 320 (Ala.Cr.App.1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)."
Owens v. State, 597 So.2d 734, 736 (Ala.Cr. App.1992).
The appellant further argues that his constitutional rights were violated because the trial court failed to order his presence at a hearing conducted pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The appellant does not argue that the record fails to show that he was present during the voir dire or selection of the jury, rather he refers to a Powers hearing which was conducted pursuant to his motion for a new trial, which was held approximately four months after the appellant was sentenced. The hearing was held in order to allow the prosecutor and defense counsel to state their reasons for striking blacks from the venire.[3] Approximately three months later, at the State's request, another hearing was held in order for the State to clarify on the record one of its reasons previously given for striking a veniremember. Specifically, the State had originally indicated that the juror was struck because he had a child in the hospital, but upon reviewing the transcript of the proceedings, the State realized that the juror had indicated that his wife worked at Children's Hospital, without any mention of a child in the hospital. The trial court determined that the juror was struck for nonracial reasons. The record does not indicate whether the appellant was present at either of these post-trial hearings. There was no objection raised by the appellant or his defense counsel based on any absence by the appellant before the issue was raised on this appeal. Therefore, this allegation must be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
While it is true that a capital defendant's right to be present at all stages of the trial cannot be waived, Neal v. State, 257 Ala. 496, 59 So.2d 797, 798 (1952), these hearings were not encompassed within the appellant's trial. In Wade v. State, 349 So.2d 141, 148 (Ala.Cr.App.1977), this court held that a trial court's denial of a defendant's request to be present at a hearing on his motion for a new trial was not error. In so holding, this court stated:
"In United States v. Lynch, 132 F.2d 111, 113 (3d Cir.1942), cert. denied, 318 U.S. 777, 63 S.Ct. 831, 87 L.Ed. 1146, it was held that the defendant's right to be present at his trial did not `embrace a right to be present also at the argument of motions prior to trial or subsequent to verdict.' Accord, Cuckovich v. United States, 170 F.2d 89 (6th Cir.1948); United States v. Makris, 398 F.Supp. 507 (S.D.Tex.1975).
"Rule 43(a) of the Federal Rules of Criminal Procedure provides:
"`A defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the empaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.'

*1131 "This is in harmony with principles that have prevailed in Alabama for many years. Rule 43(c) provides that `A defendant need not be present in the following situations:... (3) at a conference or argument upon a question of law....'"
See also Ex parte DeBruce, 651 So.2d 624 (Ala.1994) (Alabama Supreme Court looked to Rule 43, Fed.R.Crim.P., in construing the law in this State concerning the accused's right to be present at criminal proceedings in a capital murder trial). In Ex parte DeBruce, supra, the Alabama Supreme Court held that the trial court did not violate the defendant's rights under Rule 9, Ala.R.Crim. P., or the State or Federal constitutions, by DeBruce's absence from pretrial hearings that dealt only with issues of law and the possibility of a motion to proceed in forma pauperis. In addressing this issue, the Court looked to a federal case in which the defendants alleged that their right to be present was violated because of their absence from dispositional hearings that occurred after their trial. The Court stated:
"Federal Courts that have been called upon to construe Rule 43, Fed.R.Crim.P., which reads substantially like our Rule 9, have come to the same conclusion that we have reached. In United States v. Gradsky, 434 F.2d 880 (5th Cir.1970), cert. denied, sub nom. Roberts v. United States, 401 U.S. 925, 91 S.Ct. 884, 27 L.Ed.2d 828 (1971), and Gradsky v. United States, 409 U.S. 894, 93 S.Ct. 203, 34 L.Ed.2d 151 (1972), after the defendants were convicted for multiple violations of federal law, evidentiary hearings were conducted to determine whether their convictions were tainted by illegal wiretaps. The trial court found no evidence of taint and ordered the convictions reinstated. The defendants filed motions to vacate and set aside the order, alleging that their presence had been required at evidentiary hearings. The district court determined that the defendants' constitutional rights had not been infringed upon by their absence from the evidentiary hearings, and it denied motion to vacate and set aside the order. The defendants appealed. The Court of Appeals (Ingraham, Circuit Judge) held that where the defendants were represented by a competent attorney at the evidentiary hearings, and the attorney felt that the defendants' presence was unnecessary, and the attorney had an ample opportunity for cross-examination, and there was no showing that the defendants suffered prejudice by their absence, the defendants' constitutional rights were not violated by their absence and any possible error in their absence from the hearings did not affect their substantial rights. The Gradsky Court stated:
"`Assuming, arguendo, that appellants possessed the requisite standing, we find no merit in their contentions concerning their non-presence at the evidentiary hearings. The Sixth Amendment and Fed.Rules Cr.Proc. 43 do guarantee a defendant the right to be present at the arraignment and "at every stage of the trial." No appellate court has extended this right to an evidentiary hearing. Appellants place great reliance on McKissick v. United States, 379 F.2d 754 (5th Cir.1967) and Cross v. United States, 117 U.S.App.D.C. 56, 325 F.2d 629 (1963). Both cases were concerned with actions occurring during the course of the trial. In McKissick, the trial court declared a mistrial because the defendant's attorney told the court in chambers that defendant had committed perjury. The case was remanded to determine whether defendant was absent during the conversation in chambers, and if so, whether there was any prejudice to his rights. See United States v. Lewis, 420 F.2d 686, 687 (5th Cir.1970).
"`Appellants assert, however, that the Supreme Court has expressly declined to specify the procedure to be followed in evidentiary hearings, citing Giordano v. United States, 394 U.S. 310, 314, 89 S.Ct. 1163, 1165, 22 L.Ed.2d 297 (1969) (concurring opinion). Justice Stewart, in the same paragraph, explained that "nothing in Alderman v. United States,... 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 [(1969)], requires an adversary proceeding and full disclosure for resolution of every issue raised by an electronic surveillance." Taglianetti v. *1132 United States, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969).'
"434 F.2d at 882-83.
"The Court further interpreted the provisions of Rule 43 as follows:
"`The issue during the evidentiary hearings was not one of guilt or innocence but one of "taint." The purpose was to allow government employees connected with the wiretap to give testimony relevant to the question of whether the evidence leading to appellants' convictions was tainted. Their testimony was insisted upon by appellants' counsel. It is apparent that these hearings were not a "critical stage" of the proceedings within Rule 43, and appellants' actual presence cold not have aided their defense. In Stein v. United States, 313 F.2d 518, 522 (9th Cir.1962), the court held that "[t]he presence of a defendant must bear a reasonably substantial relationship to the opportunity to defend. The Constitution does not assure `the privilege of presence when presence would be useless, or the benefit but a shadow." See Snyder v. Massachusetts, 291 U.S. 97, 106, 54 S.Ct. 330, [332] 78 L.Ed. 674 (1934); Pope v. United States, 287 F.Supp. 214, 218 (W.D.Tex.1967), aff'd, 398 F.2d 834 [ (5th Cir.1968) ], cert. den., 393 U.S. 1097, 89 S.Ct. 886, 21 L.Ed.2d 787 (1969).
"`Furthermore, it is well established that Rule 43 must be considered together with Rule 52(a), Fed.Rules Cr.Proc., which provides that harmless error is to be disregarded. Peterson v. United States, 411 F.2d 1074, 1080 (8th Cir. 1969); Estes v. United States, 335 F.2d 609, 618 (5th Cir.1964). In Estes, the court found no prejudice to defendant's substantial rights, where the court in his absence submitted written charges to the jury in response to jurors' questions. In Yates v. United States, 418 F.2d 1228, 1229 (6th Cir.1969), the court found no merit to the defendant's claim that his constitutional rights had been violated by his exclusion from a hearing to suppress evidence. We likewise reject appellants' contentions that their constitutional rights have been violated, and we find beyond a reasonable doubt that any possible error in their absence from the hearings did not affect their substantial rights. Rule 52(a), Fed.Rules Cr.Proc.; Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
"`In sum, we find that appellants were represented by competent counsel during their trial and at the evidentiary hearings. Appellants were personally present at all times except for these evidentiary hearings, and their presence at these hearings would not have aided their defense. They suffered no prejudice and were not deprived of a fair trial or due process of law. Accordingly, the ruling by the court below is affirmed and the mandate shall issue forthwith. No stay will be granted pending petition for rehearing or application for writ of certiorari.'
"434 F.2d at 882-84."
Ex parte Bruce, 651 So.2d at 633-35. (Footnotes omitted.)
Even if the appellant was absent during these hearings, he has not suggested or demonstrated any possibility of prejudice resulting from his absence. Harris v. State, 632 So.2d 503, 512 (Ala.Cr.App.1992), affirmed, 632 So.2d 543 (Ala.1993), affirmed, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). Therefore, there was no error. See also Ex parte Burton, 651 So.2d 659 (Ala.1994) (no error in defendant's absence during hearing on pretrial motions); Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.1994) (no error in holding pretrial hearing in defendant's absence).

VII
The appellant argues that the trial court erred in refusing to give his requested jury instruction to the effect that evidence of prior convictions did not constitute evidence that he committed the charged crime. The specific requested charge stated: "I charge you that evidence of other offenses than those charged in the indictment is not to be considered as evidence of the truth of the matters contained in the indictment." Because this matter is being raised for the first *1133 time on appeal, it must be reviewed pursuant to the plain error rule. Rule 45A, Ala. R.App.P.
The record indicates that the trial court instructed the jury that evidence of the appellant's prior convictions was admitted for the sole and limited purpose of determining the appellant's credibility as a witness. The trial court charged the jury as follows:
"I did not tell you when we first talked that the prior robbery conviction that Mr. Gaddy has suffered subsequent to the events in December here in Birmingham is admitted for the sole and limited purpose for you to have at your disposal in assessing his credibility as a witness. The law provides if one has suffered a conviction for an offense involving moral turpitude, such as robbery, then these convictions may be called to the jury's attention. But it is for the limited purpose for you having that information at your disposal in assessing his trustworthiness. Okay?"
Thus, the trial court instructed the jury that the only purpose for which they could view that evidence was to measure credibility and not as substantive evidence of guilt. An examination of the trial court's entire jury charge, Adams v. State, 587 So.2d 1265 (Ala. Cr.App.1991), demonstrates that the jury was properly informed as to the limited purpose of the evidence of the prior crimes, and thus this matter does not rise to the level of plain error.

VIII
The appellant argues that the trial court improperly charged the jury during the guilt phase and that the jury was thus precluded from returning verdicts on "several lesser included offenses which were supported by the evidence." Specifically, the appellant argues that the trial court's instructions on the lesser included offenses of manslaughter, theft, and felony murder were made confusing by the court's response to a question from the jury, instructing it that it could not find the appellant guilty of manslaughter and theft but rather could find the appellant guilty of only one of those lesser included offenses. The appellant argues that this error was "exacerbated" by the court's failure to instruct the jury on the lesser included offense of intentional murder, as well as by the court's refusal to instruct the jury that the intent to commit robbery must be formed before the victim's death in order to support a finding of intentional murder during a robbery.

A
The appellant argues that the trial court erred in failing to instruct the jury that, unless the intent to rob was formed before the victim's death, the jury could not convict the appellant of the capital offense of murder committed during a robbery. The record indicates that, following the trial court's charge to the jury, defense counsel objected to the trial court's failure to give two charges that were requested on this matter. The following transpired at trial:
"[Defense counsel]: Gave twenty-two for me. I asked for twenty-seven, which has to do with the intent to rob formed only after the victim was killed. I don't think that is clear in the charge to the jury.
"THE COURT: Well
"[Defense counsel]: Twenty-eight.
"THE COURT:Don't they understand that the theft-robbery component is integrally connected to the death component. I think I told them repeatedly that was the case.
"[Defense counsel]: Well, I think you did and I [did] also the boiled-down context, which is contained in Connolly v. State, which is listed in number 27, is basically a correct statement of the law taken straight from the case and it explains it in very clear and concise language rather than integrally related and things of that nature; much less complicated and subject to
"THE COURT: Well, I told them about what `during' means, and so forth. I am going to let it sit and give you a clear shot on that. Denied.
"[Defense counsel]: Okay.
"THE COURT: I am not satisfied that the word `robbed' is correct, it might should be `theft.' I don't know. Go ahead."
*1134 The requested charges by the defense counsel stated, respectively:
"An accused is not guilty of capital robbery-murder where the intent to rob was formed only after the victim was killed. Connolly v. State, 500 So.2d 57 (Ala.Cr. App.1985), aff'd, 500 So.2d 68 (1986)."
"In a capital murder case, intent to kill may not be supplied by the felony murder doctrine, that is, should the circumstances fall short of proving an intentional killing during the course of a robbery, and should the circumstances fall short of proving that an intent to rob was formed prior to the victim being killed, then the crime is not capital murder but some lesser included offense thereof."
A review of the charge given by the trial court to the jury indicates that the jury was fully informed of the elements of the offense of capital murder during a robbery, including the meaning of "during" as it relates to the murder being committed in connection with the commission of the robbery. While it is clear that in this capital offense, the property may not have been taken as a mere afterthought to the murder, the Alabama Supreme Court has held that if the murder and the robbery formed a continuous chain of logically related events, the offense is proven. Ex parte Johnson, 620 So.2d 709 (Ala.1993), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993), citing Hallford v. State, 548 So.2d 526 (Ala. Cr.App.1988), affirmed, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).
"To sustain a conviction under § 13A-5-40(a)(2), the State must prove beyond a reasonable doubt (1) a `robbery in the first degree or attempt thereof' as defined by § 13A-8-41; (2) a murder as defined by § 13-6-2(a)(1); and (3) that the murder was committed `during' the robbery or attempted robbery, i.e., that the murder was committed `in the course of or in connection with the commission of, or in the immediate flight from the commission of' the robbery or attempted robbery in the first degree. [Section] 13A-5-39(2); Hallford v. State, supra 548 So.2d 526 (Ala.Cr. App.1988), affirmed, Ex parte Hallford, 548 So.2d 547 (Ala.), cert. denied, Hallford v. Alabama, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). Moreover, the capital offense of robbery-murder encompasses a robbery-murder in which the killed is not the person robbed. Taylor v. State, 442 So.2d 128 (Ala.Crim.App.1983). The fact that the murder victim was dead when the property was taken would not prevent a finding of robbery, if the murder and the taking of the property form a continuous chain of logically related events. Hallford. The question whether the defendant had the intent to kill at the time of the taking is usually a jury issue, and the jury may infer from the facts and circumstances that a robbery began when the accused attacked the victim and that the capital offense was consummated when the accused took the robbery victim's property and fled. Hallford."

620 So.2d at 713-14. See also Padgett v. State, 668 So.2d 78 (Ala.Cr.App.1995) (involving a capital murder during a rape, in which this court stated, "if the jury found that the appellant formed the intent to rape the victim while he was killing her, and then had sex with her even though she was dead, he is still guilty of murder while committing the underlying offense, and the capital murder statute still applies." 668 So.2d at 84). Similarly, in Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App.1994), a case involving the capital offense of murder committed during the course of a sodomy and a burglary, the appellant argued that the State failed to prove the offense of murder during a sodomy because, he said, the evidence indicated that the victim was dead when she was sodomized and no evidence was presented to indicate that the appellant formed the intent to sodomize the victim before she was killed. However, this court cited Hallford v. State, supra 548 So.2d at 534, to support its conclusion that the murder occurred during the sodomy:
"`The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating in *1135 the act of intentionally killing the victim; the offense consist of two elements, robbing and intentional killing.... The intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing ... While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs.'"
This court, in Hutcherson v. State, noted that:
"`The jury was not required to believe defendant's tale of bestialitythat the thought of sexual activity did not occur to him until after he had driven around for a half hour in a vain search for a policeman to whom he could turn over [the victim's] dead body. Even if the rape occurred after death, the jury could have believed that the assault was sexually motivated and that the criminal sexual conduct and the homicide were one continuous transaction making the crime first degree felony murder.'"
677 So.2d at 1195, quoting State v. Nielsen, 467 N.W.2d 615, 618 (Minn.1991).
The evidence presented by the State in the present case, including the appellant's statement, proves that the appellant intended to "roll" or rob the victim from their initial contact. The jury did not have to believe the appellant's trial testimony, i.e., that he was acting in self-defense and merely robbed the victim after his death in order to facilitate his escape. There was ample evidence that the murder occurred during the course of committing a robbery in the first degree.

B
The appellant argues that the jury should have been charged by the trial court on intentional murder as a lesser included offense of capital murder. This argument is being raised for the first time on appeal and, therefore, must be analyzed pursuant to the plain error standard. Rule 45A, Ala. R.App.P.
The record indicates that, after charging the jury on the capital offense of robbery-murder, the trial court charged the jury on the offense of felony murder. The jury was then charged as to the lesser included offenses of reckless manslaughter and provocation manslaughter. Thereafter, the trial court charged the jury on self-defense as argued by the appellant through his trial testimony, and on the lesser included offense of theft, should the jury believe that the murder was committed in self-defense.
In the present case, the trial court did not charge the jury as to intentional murder as a lesser included offense, because the evidence presented did not support a rational basis for a conviction of intentional murder. The State's evidence indicated that the appellant intended to rob the victim when he accompanied him to his home. He then engaged in a struggle with the victim in order to rob him and, using a knife that he had brought to the scene, the appellant murdered the victim and escaped with some of his property. The appellant's theory of the case, as established by his trial testimony, was that he did not intend to kill the victim, but rather that he acted in self-defense against the victim's assaults. There is no theory which does not include a robbery in connection with the death; therefore, if there was an intentional murder, then the offense was capital murder during a robbery.
In Brown v. State, 623 So.2d 416 (Ala.Cr.App.1993), this court stated:
"It was not necessary here to charge on every conceivable lesser included offense, down to discharging a firearm. The jury was given the choice of finding the appellant guilty of capital murder, guilty of felony murder, or not guilty of any crime. The jury conviction him of capital murder. Therefore, we must logically conclude that an instruction on ... [a lesser included offense], although proper, would not have affected the outcome of this case. Ex parte Jordan, 486 So.2d 485, 489 (Ala.Cr. App.1986). Thus, the refusal to instruct on any other lesser included offense was, at the worst, merely harmless error. Rule 45, A.R.App.P. See also Phelps v. State, 435 So.2d 158 (Ala.Cr.App.1983)."
623 So.2d at 420-21.
"A trial judge ... may refuse to charge on a lesser included offense when it is *1136 clear to the judicial mind that there is no evidence to support such a charge. Mullis v. State, 545 So.2d 205, 211 (Ala.Crim.App. 1989); Gurganus v. State, 520 So.2d 170 (Ala.Crim.App.1987). A court should not charge the jury on a lesser included offense `unless there is a rational basis for a verdict convicting the defendant of the included offense.' Ala.Code 1975, § 13A-1-9(b)."
Dill v. State, 600 So.2d 343, 352 (Ala.Cr.App. 1991), affirmed, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993). In the present case, the trial court did not err in failing to charge the jury on intentional murder as a lesser included offense of capital murder.

C
The appellant argues that the trial court's statements to the jury made in response to a juror's question, telling it that it could find the appellant guilty of manslaughter or theft as a lesser included offense, but not both, precluded the jury from returning a verdict on the lesser included offense of provocation manslaughter.
The record indicates that, following the trial court's instructions to the jury, defense counsel objected to the trial court's instruction as to what provocation is necessary for a finding of "heat of passion" manslaughter. Defense counsel objected as follows:
"[Defense counsel]: Number 31, I asked at the sidebar that 31 be given because I thought your charge on heat of passion manslaughter seemed to preclude this jury's finding the defendant guilty of heat of passion manslaughter, when in fact the circumstances when viewed by the appellate court on many occasions of this case could reasonably be construed to be heat of passionelements of heat of passion.
"THE COURT: I simply read the suggested jury charge on that. Tried to cover you on that when I talked about imminent appearance on self-defense. Appearances, reasonable hot blood, not
"[Defense counsel]: But you went further in heat of passion and basically said that it had to be, if my recollection serves me correctly, that some type of assault was necessary.
"THE COURT: Well, opprobrious words are never sufficient, nor minor technical assaults and batteries.
"[Defense counsel]: But his case clearly states that appearances of imminent assault may be sufficient, which would clearly bring this case into the realm of provocation manslaughter.
"THE COURT: All right. What else?
"[Defense counsel]: Is that a yes?
"THE COURT: No, it is a no. Go ahead. Overruled."
Although the trial court overruled the appellant's objection, he did have the jury brought back into the courtroom and further charged it, pursuant to the above objection, as follows:
"Now, as you know, I count on the lawyers to keep me abreast of the changing laws, I want to go over again that provocation manslaughter with you.
"I told youwell, I first went to the Code book and read manslaughter: Number one, if one recklessly causes the death of another person, you know that is reckless manslaughter. We got that by way of the alcohol and marijuana ingestion, you recall that.
"Two, if he causes the death of another person under circumstances that would constitute intentional murder except that he causes the death due to sudden heat of passion caused by provocation recognized by law and before a reasonable time for passion to cool and for reason to reassert itself.
"You should know that the appearance of an imminent assault may be sufficient to arouse one's heat of passion, which would constitute a legal provocation.
"I told you that mere abusive or argumentative or opprobrious words or insulting gestures are not sufficient to amount to legal provocation nor are minor or technical assaults and batteries which do not cause considerable pain or injury. I should have also told you that appearance of an imminent assault may be sufficient to arouse heat of passion, which again would *1137 constitute legal provocation. I went on to tell you how that has to operate to reduce a murder to a manslaughter.
"I thought it wise to tell you again that you will return one verdict, guilty of capital murder, guilty of felony murder, guilty of provocation manslaughter, guilty of reckless manslaughter, guilty of first degree theft or not guilty. Just by way of caution, I wanted to remind you of that. Okay?
"Mr. Culpepper is going to give you the verdict forms which will be a reminder of the generic names of the offenses. All right? Sorry to bother you.
"A JUROR: Can I ask a question of that?
"THE COURT: Yes, sir.
"A JUROR: We cannotthere cannot be a verdict of guilty of one of the type of manslaughters and first degree theft?
"THE COURT: No, sir.
"A JUROR: Only one verdict out of all of them, right?
"THE COURT: That is correct.
"Any exceptions, [defense counsel], to the court's charge in toto?
"[Defense counsel]: No, sir, I told you that I would not except."
The portion of the trial court's instructions to the jury to which the appellant now objects is the trial court's response to the juror that a verdict of guilt as to manslaughter and as to first degree theft could not be returned. Because the appellant did not object to this matter previously, in order to constitute reversible error, this issue must rise to the level of plain error. Rule 45A, Ala.R.App.P. The appellant argues that this response by the trial court, when coupled with his earlier instruction as to the relation of the different offenses, prohibited the jury from finding the appellant guilty of the lesser included offense of provocation manslaughter as follows.
However, a review of the trial court's entire charge, including its earlier charge on provocation manslaughter, indicates that the trial court's charge did not preclude a finding of provocation manslaughter. The trial court charged the jury as to provocation manslaughter:
"Provocation manslaughter. Remember there are two routes to manslaughter. The second route to manslaughter is provocation manslaughter. In order for you to consider provocation manslaughter, thoughand this is importantthat you must not believe beyond a reasonable doubt that the theft of Mr. Caldwell's property was committed in connection with the homicide component, because this would be felony murder. Robbery component, robbery of any degree or any felony dangerous to human life and the death of the mandeath doesn't have to be intentionalfelony murder.
"In other words, in the event you find that the killing or death of Mr. Caldwell is unrelated to the theft of his property, that the killing was not committed during the commission of the robbery theft component, then you can consider the provocation manslaughter."
Thus, the jury was clearly informed that it could return a verdict of provocation manslaughter if its findings based on the evidence supported that conviction. The trial court's response to the juror's question was to inform him that the jury could return only one verdict. Such an instruction is proper. See Thompson v. State, 473 So.2d 1205, 1209 (Ala.Cr.App.1985). See also Hayes v. State, 44 Ala.App. 499, 214 So.2d 708, 709 (1968).
The trial court's statement to the juror in response to his question did not constitute plain error.

IX
The appellant argues that the trial court improperly defined the "reasonable doubt" for the jury, thereby allowing the jury to convict the appellant on a standard of proof below that required by the United States Constitution. The appellant raises this argument for the first time on appeal; therefore, it must be analyzed pursuant to the plain error standard. Rule 45A, Ala. R.App.P.
In support of his argument, the appellant cites the entire jury charge given by the trial court concerning the reasonable doubt standard. The appellant argues that this jury charge far surpassed the "beyond a reasonable *1138 doubt" standard and served to place the burden of proof on the appellant. The trial court's instructions to the jury concerning the reasonable doubt standard were as follows:
"The burden of proof is not on the defendant in a criminal case, it is on the State.
"The State has to go forward with strong and cogent evidence that convinces you people beyond a reasonable doubt or to a moral certainty that Mr. Gaddy is guilty of one of the charged offenses before you would be authorized to convict.
"In other words, it is proof beyond a reasonable doubt and to a moral certainty that overcomes the presumption of innocence.
"Now, the State will tell you, and they are right, they don't have to prove guilty beyond all possible doubt. The State does not have to prove guilt to a mathematical certainty. How could you do that when your testimony comes from human beings here on the witness stand?
"Let me go to what one of the judges in Montgomery says, and I will use Mr. Gaddy's name to personalize what I am going to say to you. The State is not required to convince you of Mr. Gaddy's guilty beyond all doubt and to the point that you could not possibly be mistaken, but simply beyond all reasonable doubt and to a moral certainty.
"If after comparing and considering all of the evidence in the case, if your minds are left in such a condition that you cannot say that you have an abiding conviction here to a moral certainty of Mr. Gaddy's guilt of one of these charged offenses that we will discuss here in a minute, then you would not be convinced beyond a reasonable doubt and the man should be acquitted.
"On the other hand, it would be helpful to you to say again that the doubt which would justify an acquittal here in the State v. Gaddy case, must be an actual and a substantial doubt and not a mere possible doubt.
"A reasonable doubt, folks, is not a mere guess or a surmise, it is not what the law calls a forced, capricious doubt. So, the flip side, after considering all of the evidence in the case, if you have an abiding conviction of the truth of the charge, then you would be convinced beyond a reasonable doubt and the man should be convicted of whatever it is the offense is that you are so convinced. As you will see, there are several offenses which you will be considering.
"But, the reasonable doubt which would entitle Mr. Gaddy to an acquittal is not a mere fanciful, vague or conjectural doubt, but a reasonable, substantial doubt arising from the evidence and remaining after a careful consideration of the testimony such as reasonable and fair-minded, conscientious folks such as yourselves would entertain under all the circumstances.
"Now, a reasonable doubt may spring from the evidence, from a lack of evidence or from any part of the evidence."
The appellant argues that the trial court's reasonable doubt instruction violated the United States Supreme Court's holding in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).
"In Cage v. Louisiana, [498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990)] the United States Supreme Court found that if the instruction equated `reasonable doubt' to `grave uncertainty' and `actual substantial doubt,' and stated that what was required was `moral certainty,' a reasonable jury could interpret the instruction to allow a lesser degree of proof to convict than that required by the Due Process Clause. It was the use of all three phrases in conjunction with each other that the Supreme Court determined was unconstitutional in Cage. Gaskins v. McKellar, 500 U.S. 961, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991)."
Sockwell v. State, 675 So.2d 4, 23 (Ala.Cr. App.1993). However, where some of the terminology found offensive in Cage v. Louisiana, supra, is used in a reasonable doubt instruction, reversible error does not automatically result. Stewart v. State, 601 So.2d 491 (Ala.Cr.App.1992), reversed in part and remanded on other grounds, 659 So.2d 122 (Ala.1993); Smith v. State, 588 So.2d 561, 562 *1139 (Ala.Cr.App.1991); Williams v. State, 601 So.2d 1062 (Ala.Cr.App.1991), affirmed without opinion, 662 So.2d 929 (1992).
Following the decision in Cage v. Louisiana, supra, the United States Supreme Court re-examined the propriety of a jury instruction concerning the reasonable doubt standard in Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).
"In Victor v. Nebraska, the Supreme Court `accept[ed] ... [the] premise that "moral certainty," standing alone, might not be recognized by modern jurors as a synonym for "proof beyond a reasonable doubt."' 511 U.S. at 14, 114 S.Ct. at 1247. However, the Court determined that when the phrase `moral certainty' was used in conjunction with the other language explanatory of the standard of proof required to convict, it was not unconstitutional.
"`[T]he moral certainty language cannot be sequestered from its surroundings. In the Cage [v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990)], instruction, the jurors were simply told that they had to be morally certain of the defendant's guilt; there was nothing else in the instruction to lend meaning to the phrase. Not so here. The jury ... was told that a reasonable doubt is "that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." The instruction thus explicitly told the jurors that their conclusion had to be based on the evidence in the case.'

"Victor v. Nebraska, 511 U.S. at 16, 114 S.Ct. at 1248 (emphasis in original) (citation omitted)."
Inmin v. State, 654 So.2d 86 (Ala.Cr.App. 1994). The Alabama Supreme Court evaluated the use of other challenged terminology in the instruction defining reasonable doubt, such as "not a mere possible doubt," "substantial doubt," and "strong probabilities." See Dobyne v. State, 672 So.2d 1319 (Ala.Cr. App.1994). The Supreme Court concluded that, despite the use in the reasonable doubt instructions of the challenged terminology, when the entire charge was viewed, the instructions were proper because the trial court informed the jury that its verdict had to be based upon the evidence.
In the present case, the trial court instructed the jury:
"[A]fter considering all of the evidence in the case, if you have an abiding conviction of the truth of the charge, then you would be convinced beyond a reasonable doubt and the man should be convicted.... But the reasonable doubt which would entitle Mr. Gaddy to an acquittal is not a mere fanciful, vague or conjectural doubt, but a reasonable, substantial doubt arising from the evidence and remaining after a careful consideration of the testimony such as reasonable and fair-minded, conscientious folks such as yourself would entertain under all the circumstances."
Thus, the trial court's charge was proper. See Inmin v. State, supra; Dobyne v. State, supra; Slaton v. State, 680 So.2d 879 (Ala.Cr. App.1995), modified on rehearing, [Ms. CR-89-848, April 14, 1995] (Ala.Cr.App.1995).

X
The appellant argues that the prosecutor improperly urged the jury to convict the appellant by emphasizing the impact of the victim's death on his mother. The record indicates that, during the prosecutor's closing argument at the guilt phase, he stated:
"... A decision we all have to live with, I want you to think about this. Yeah, we all have to live with it and why? This is the State of Alabama v. Richard Gaddy. That's just a formal way to say what this case is about. But, there has been a nice little lady sitting right there in the second row the whole time, look at her.

"[Defense counsel]: I object to it.
"THE COURT: I don't know what you're going to say.
"[Prosecutor]: This doesn't
"[Defense counsel]: It is not in evidence and we object to it.
"[Prosecutor]: This doesn't affect the people that are sitting in the courtroom, this affects every citizen of this county, every citizen that lives in the eastern side of the *1140 city and his sister. And his brother, that's who it affects. Sure it affects him, he is here by his own hand, not by the hand of the victim and not by the hand
"[Defense counsel]: We are going to object to the comments of the district attorney about the family of the victim.
"THE COURT: We're beyond that, sir. Go ahead."
(Emphasis added.)
The appellant acknowledges in his brief on appeal that the record does not indicate whether the "nice little lady" was a relative of the victim. The appellant argues "[e]ven if this is not a necessary suggestion and no matter who the `nice little lady' was, the district attorney's direction to the jury underscores his argument that [the jury] should consider the verdict's impact on the victim's family."
However, immediately following this statement, the prosecutor referred to the impact of this crime on society and the community. Such comments have been held to be proper arguments for prosecutors during their closing arguments to the jury.
"`[I]n Alabama, the rule is that a district attorney in closing argument may make a general appeal for law enforcement.' Ex parte Waldrop, 459 So.2d 959, 962 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). Thus, in Varner v. State, 418 So.2d 961 (Ala.Cr.App. 1982), the prosecutor commented, `We can't work for anything and hold on to it nowadays because people like Mr. Varner are going out and stealing it' and `this court held that the comment was within the latitude allowed prosecutors in their exhortations to the jury to discharge their duties in such a manner as, not only to punish crime, but to protect the public from like offense.' Orr v. State, [462 So.2d 1013, 1016 (Ala.Cr.App.1984) ]."
Middleton v. State, 495 So.2d 726, 727-28 (Ala.Cr.App.1986) (the prosecutor's comment in a case involving possession of a controlled substance that "[t]hey are trying to protect us from dopers like that defendant right there").
Even if the lady to whom the prosecutor referred was a relative of the victim, it is clear that she had a right to be in the courtroom. Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App.1994) ("the presence of a member of the victim's family is specifically allowed by § 15-14-56(a), Code of Alabama 1975....) Moreover, emotional outburst by a spectator or family member during a criminal trial, even where the outburst may influence or disturb the jury, does not require reversal "unless it appears that the rights of accused were prejudiced thereby, and, generally in the absence of showing to the contrary, it will be assumed that the jury was not prejudiced thereby...." DeBruce v. State, 651 So.2d 599 (Ala.Cr.App.1993), affirmed, 651 So.2d 624 (Ala.1994).
In the present case, the prosecutor made no comment or statement concerning the impact of the victim's death on his family, nor did he make a plea to the jury to consider such evidence. Therefore, the appellant suffered no prejudice and was not denied his rights to a fair trial. Cf. Ex parte Crymes, 630 So.2d 125 (Ala.1993).

XI
The appellant argues that the trial court erred in refusing to give his requested instruction during the sentencing phase that the jury should presume him innocent of any aggravating circumstances. The charge requested by the appellant was as follows:
"The law presumes that a defendant convicted of a capital murder is innocent of any aggravating circumstances. The presumption of innocence is sufficient to justify a finding that no aggravating circumstances exist. Unless you are satisfied beyond a reasonable doubt of the defendant's guilt of at least one aggravating circumstance, you are instructed to return a verdict sentencing Richard Gaddy to life imprisonment without parole."
Under the facts of this case, the requested charge was not a correct statement of the law. The jury had already found the appellant guilty of committing intentional murder during the course of a robbery. "[A]ny aggravating circumstance which the verdict convicting the defendant establishes *1141 was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." § 13A-5-45(e), Code of Alabama 1975. Therefore, the jury's verdict had already established beyond a reasonable doubt at least one aggravating circumstance for sentencing purposes, specifically that the murder was committed during the course of robbery as set forth in § 13A-5-49(4), Code of Alabama 1975. "In obtaining the appellant's conviction, the state proved the aggravating circumstance that the murder was committed during the course of a robbery. See Kuenzel, 577 So.2d at 486-87." Taylor v. State, 666 So.2d 36, 70 (Ala.Crim.App. 1994). Therefore, because at least one aggravating circumstance was already established by the verdict, the appellant's requested charge was improper.

XII
The appellant argues that the trial court improperly refused his requested jury instruction at the sentencing phase that the jury could recommend life without parole based on feelings of mercy. The requested charge stated:
"If you see fit, whether mitigating circumstances exist or not, you may recommend mercy for Richard Gaddy. This recommendation is solely in your discretion and not controlled by any rule of law. You may make such recommendation with or without reason."
This requested charge was not proper under the law in Alabama. This court's reasoning in Taylor v. State, wherein the trial court properly prohibited testimony from the appellant's family and friends requesting that the jury spare the appellant's life, is applicable to the present situation. In Taylor v. State, 666 So.2d at 52, this court stated:
"Although Payne v. Tennessee, 501 U.S. 808, 826-28, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991), held that the Eighth Amendment does not prohibit the admission of `victim impact' evidence at the sentencing phase of a capital trial,
"`Payne merely put aside the bar to the introduction of and comment upon victim impact evidence which had been created in Booth [v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) ], and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). The Court did not expand the universe of admissible relevant mitigating evidence established by Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ... We cannot agree Payne portends admissibility of any evidence other than that related to the victim and the impact of the victim's death on the members of the victim's family. Nothing said by the Court suggests the Court intended to broaden the scope of relevant mitigating evidence to include the opinion of a victim's family member that the death penalty should not be invoked....
"`We can take cognizance of the Court's rationale that victim impact evidence relates directly to the harm resulting from a defendant's act. The Chief Justice stated:
"`"Victim impact evidence is simply another form or method of forming sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities."
"`Payne, 501 U.S. at 825, 111 S.Ct. at 2608. In this context, the desire of the victim's relative in no way constitutes relevant evidence because it does not relate to the harm caused by the defendant.'
Robison [v. Maynard], 943 F.2d [1216], 1217-18 [ (10th Cir.1991) ].
"Under Alabama Law, nonstatutory mitigating evidence must be relevant.
"`In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, *1142 and any other relevant mitigating circumstance which the defendant offers as a basis for a life of imprisonment without parole instead of death.'
"Ala.Code 1975, § 13A-5-52. `"[S]ubject only to the loose evidentiary requirement of relevance, Defendants have a right to offer any evidence they choose on character or record or circumstances of the offense." `Clisby v. State, 456 So.2d 99, 101 (Ala.Crim.App.1983) (quoting Stanley v. Zant, 697 F.2d 955, 960 (11th Cir.1983)), cert. denied, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984).
"`Evidence is "relevant" if it logically relates to the ultimate material inference in the case for which it is proffered.' J. Colquitt, Alabama Law of Evidence § 4.1 (1990). "Evidence is relevant if it has any probative value, however slight, upon a matter at issue in the case." Phelps v. State, 439 So.2d 727, 736 (Ala.Crim.App. 1983). "Evidence is relevant if it has any tendency to throw light upon the matter in issue, even though such light may be weak and fall short of demonstration." Austin v. State, 434 So.2d 289, 292 (Ala.Cr.App. 1983).' Brewer v. State, 644 So.2d 39 (Ala. Cr.App.1994). `In this state, evidence is relevant if it has any logical relationship to the purpose for which it is offered.' Rose v. State, 598 So.2d 1040, 1042 (Ala.Cr.App. 1992).
"It is the holding of this Court that the opinion of the friends or relatives of the defendant that the defendant should not be sentenced to death is not a relevant mitigating circumstance for the jury to consider at the penalty phase of a capital case. Compare McGahee v. State, 632 So.2d 976, 978 (Ala.Cr.App.), affirmed, 632 So.2d 981 (Ala.1993) (`The physical effects of electrocution are not an aspect of the appellant's character or record and are not relevant to any of the circumstances of the crime; and we conclude that this type of evidence does not constitute evidence of mitigation.'); Hinton v. State, 548 So.2d 547, 560-61 (Ala.Cr.App.1988), affirmed, 548 So.2d 562 (Ala.1989), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989) (`We interpret this section to limit mitigating evidence to that which assumes that the defendant committed the crime for which he was convicted.... This court therefore finds that polygraph results which indicate that the defendant is not guilty of the crime for which he is being sentenced are not relevant to either aggravating or mitigating circumstances and thus are inadmissible in a sentencing proceeding under § 13A-5-45(d)')."
Because the requested charge by the appellant suggests that the jury recommend life without parole arbitrarily and based solely on mercy, the instruction was improper.
"The jury may not recommend mercy without reason. See Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). The jury does not have an `unfettered option' to recommend a sentence of life without parole unless after weighing the aggravating and mitigating circumstances it finds that life without parole is warranted."
Williams v. State, 601 So.2d 1062, 1081 (Ala. Cr.App.1991). In Alabama, the jury must consider any relevant aggravating circumstances and mitigating circumstances, including any non-statutory mitigating circumstances introduced by the appellant that are relevant. The weight to be accorded the circumstances is a matter for the jury and the record indicates that the jury was properly instructed on how to weigh the circumstances. Therefore, there was no error on this ground.

XIII
The appellant argues that the trial court improperly refused certain requested jury instructions on mitigating circumstances where the existence of those mitigating circumstances was undisputed. Specifically, the appellant argues that the trial court improperly refused the following requested instruction:
"3. In deciding whether to recommend a sentence of death or life imprisonment with the possibility of parole, you must consider all of the mitigating circumstances *1143 presented by the defense. That is, you should focus your attention on the character of the person who committed the crime, Richard Gaddy. Thus, you must consider the following mitigating factors which are arguably supported by the evidence.
"`....
"`E. The broken home from which Richard Gaddy came....
"`F. Richard Gaddy's prior family history that would reasonably be expected to contributed [sic] to his criminal conduct....
"`G. The fact that Richard Gaddy had been placed into the custody of the state by his parents as an unwanted child and as a result he ran away repeatedly and became homeless, unskilled and unable to hold employment.
"`....
"`J. Richard Gaddy's expression of remorse for the death of the victim.
"`K. Richard Gaddy's behavior changing around the age of 13 when he began using drugs.
"`L. Richard Gaddy was under the influence alcohol and drugs, and had been using crack cocaine and other drugs of abuse for a substantial period of time both before and after the offense.'"
According to § 13A-5-45(g), Code of Alabama 1975:
"The defendant shall be allowed to offer any mitigating circumstance defined in sections 13A-5-51 and 13A-5-52. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."
In weighing the aggravating and mitigating circumstances, the jury is not free to arbitrarily ignore any factor, whether aggravating or mitigating, in arriving at the correct sentence. Whisenhant v. State, 482 So.2d. 1225 (Ala.Cr.App.1982), affirmed in part and remanded with directions, 482 So.2d 1241 (Ala.1983), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990). While a trial court may instruct a jury on what it may consider as aggravating or mitigating circumstances, the jury is under no statutory or constitutional duty to make specific findings of aggravating or mitigating circumstances. Haney v. State, 603 So.2d 368, 388 (Ala.Cr.App.1991), affirmed, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
"A capital sentencer may not refuse to consider or be `precluded from considering' mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978)). The capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding his character or record and any of the circumstances of the offense, and consideration of such evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987)."
Haney v. State, supra, 603 So.2d at 389.
The record indicates that the trial court charged the jury on the statutory mitigating factors and further stated:
"Now there is more. A mitigating circumstance does not have to be included in this list that I have read you in order for it to be considered by you people. In addition to what I have read you from the list that's in the law book previously specified, mitigating circumstances shall include any aspect of Mr. Gaddy's character or any record or any other circumstances of the offense that Mr. Gaddy here offers as a basis for a sentence of life imprisonment without parole instead of death.
"A mitigating circumstance considered by you should be based on the evidence that you have heard. When the factual existence of an offered mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of that circumstance by the preponderance of the evidence.

*1144 "The burden of disproving it by a preponderance of the evidence means that you are to consider the mitigating circumstance exists unless, taking the evidence as a whole, it is more likely than not that the mitigating circumstance does not exist.
"So, if there is a factual dispute over the existence of a mitigating circumstance, then you people should find and consider that mitigating circumstance unless you find that the evidence is such that it is more likely than not that the mitigating circumstance did not exist."
Thus, the trial court properly instructed the jury as to its role in weighing the evidence, as well as to the burden of proof for establishing the mitigating circumstances. The trial court also instructed the jury as to what areas of the evidence were proper considerations for finding mitigating circumstances. In light of the entire instructions to the jury, any error in the trial court's refusal to give the charge requested by the appellant was harmless. Rule 45, Ala.R.App.P. See Carroll v. State, 599 So.2d 1253 (Ala.Cr.App. 1992), affirmed, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994), (wherein this court held that, despite the trial judge's instructions to the jury that it "should" consider mitigating circumstances rather than the jury "must" consider them, a review of the court's entire charge reveals that the jury was properly informed of its obligation that it "must" perform in arriving at its verdict). See also Gurley v. State, 337 So.2d 97 (Ala. Cr.App.1976); Kennedy v. State, 291 Ala. 62, 277 So.2d 878 (1973).
The appellant further argues that the trial court erred by not charging the jury as to the first statutory mitigating factor, i.e., his lack of prior significant history of criminal activity. § 13A-5-51, Code of Alabama 1975. However, the record indicates that defense counsel agreed that this mitigating factor would not be put forth for consideration. The following transpired before the jury was charged at sentencing:
"THE COURT: Let's talk on the record a little bit about how this came to pass. We are going, by agreement, to submit to the jury a document called `Mitigating circumstances shall include, but not be limited to the following': We agreed to knock out number one about the lack of prior significant history of criminal activity, because the rebuttal would have been so great.
"And I have showed it to the lawyers and you approve of it going back, do you not, gentlemen?
"[Defense counsel]: Yes, sir."
The following transpired thereafter:
"THE COURT: Court's Exhibit 4 was the mitigating circumstances that we decided to put in and agreed to knock out the first one, that the defendant had no prior significant history of criminal activity, plus it would have invited some rebuttal.
"[Defense counsel]: You are making reference to the first statutory mitigating circumstance?
"THE COURT: Correct.
"[Defense counsel]: And the State wanted to introduce evidenceif we put that in, the State wanted to introduce evidence to rebut that.
"THE COURT: Right. And you did not claim that there was no significant history of prior criminal activity, did you?
"[Defense counsel]: No. My charge basically stated that he had no prior history of violent criminal activity.
"THE COURT: All right. But, this all went to the jury room by agreement, Walter, and now I will turn it over to you."
Because defense counsel agreed that the jury should not be charged as to this first statutory mitigating circumstance, any error he now claims was invited. "`"Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby." Phillips v. State, 527 So.2d 154, 156 (Ala.1988).' Jones v. State, 631 So.2d 285, 288 (Ala.Cr.App. 1993). See also Rowe v. State, 625 So.2d 1210 (Ala.Cr.App.1993)." Armstead v. State 659 So.2d 188, 191 (Ala.Cr.App.1994).
Moreover, because the appellant admitted, on cross-examination during the guilt phase, that he had been convicted of two robbery charges before his arrest on the *1145 present charge, there was no error in failing to submit this mitigating circumstance to the jury.

XIV
The appellant argues that his sentence of death was improperly based in part on unadjudicated crimes, specifically the unlawful possession of a pistol. The appellant raises this issue for the first time on appeal; therefore, it must be analyzed pursuant to the plain error standard. Rule 45A, Ala. R.App.P.
The appellant argues that the trial court considered this charge in determining that the first statutory mitigating circumstance, i.e, the lack of prior criminal activity, did not exist. In its findings as to the existence of mitigating circumstances in its sentencing order, the trial court found that the first mitigating circumstance did not apply. The sentencing order states:
"The presentence report reflects the following Record of Arrest(s)
"07-17-79 PD Kansas City, MO Burg./Stealing Granted 24 mos. Prob., fined $150, and rest. of $500. Prob.rev. 8/26/80 and sentenced to 150 days
"07-16-80 PD Independence, MO Stealing Sent. 154 days
"03-08-89 PD Augusta, GA Theft by shoplifting Fined $500 and 90 days susp. upon receipt of fine on 4/20/89.
"12-13-89 SO Saluda County, S.C. Unlawful poss. of pistol Disposition not given
"12-19-89 SO Aiken County, S.C. Armed Robbery (2 counts) Convicted of strong arm robbery and sent. to 10 yrs. with 3 yrs. to serve and 5 yrs. Prob. on 4/10/90"
"Moreover, as noted above, defendant admitted on the stand the commission of two robberies subsequent to killing Mr. Caldwell. This is the only statutory mitigating circumstance not submitted to the jury at second phase."
The order's referral to the apparently unadjudicated unlawful possession of a pistol charge was harmless error in this case.
"The purpose of requiring a trial court to issue a sentencing order in a capital case is to allow an appellate court to review a death sentence. See Fortenberry v. State, 545 So.2d 129, 144 (Ala.Crim.App. 1988), aff'd, 545 So.2d 145 (Ala.1989). `"As long as the trial judge properly exercises his discretion and the facts indicating the death penalty are `so clear and convincing that virtually no reasonable person could differ,' a harmless error analysis can be used."' Id. (Citations omitted)."
Sockwell v. State, 675 So.2d 4 (Ala.Cr.App. 1993) (wherein the trial court's referral to non-record evidence in his sentencing report was held to be harmless error); Ex parte Stewart, 659 So.2d 122 (Ala.1993) (trial court's referral to "extraneous matters" in its sentencing order was harmless error). In the present case, where the appellant admitted to two prior felonies on the stand, any inclusion of the unlawful possession of a pistol charge in the court's consideration was harmless. We also note that the appellant agreed that this mitigating circumstance should not be submitted to the jury for its consideration.

XV
The appellant argues that the trial court's sentencing order is erroneous because it is not specific as to the nonstatutory mitigating circumstances. The appellant does not contend that the trial court was not sufficiently specific as to the statutory mitigating circumstances.
The record indicates that the trial court's sentencing order concerning the nonstatutory mitigating circumstances, pursuant to § 13A-5-52, Code of Alabama 1975, was as follows:
"13A-5-52. SameInclusion of Defendant's Character, Record, Etc.
"In addition to the mitigating circumstances specified in § 13A-5-51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as *1146 a basis for a sentence of life imprisonment without parole instead of death.
"`Does exist.
"`Defendant's trial testimony, the psychologists' testimony and exhibits at third stage lead one to the inescapable conclusion that Richard Eugene Gaddy is one of life's impoverished souls, permanently scarred through parental abuse, neglect and rejection during childhood and adolescence culminating in a dysfunctional adult life.'"
The appellant argues that this finding by the trial court is insufficiently specific to afford meaningful appellate review. However, an examination of the entire sentencing order reveals a detailed rendition of the facts and evidence presented at the sentencing hearing, as well as a description of the exhibits admitted during that hearing. The trial court's order stated that it considered the facts and exhibits presented during the final sentencing hearing when finding the nonstatutory circumstances existed. A trial court is not required to specifically list the evidence relied on in finding the existence of a nonstatutory mitigating circumstance. Cochran v. State, 500 So.2d 1161 (Ala.Cr.App.1984), affirmed, 500 So.2d 1064 (Ala.1986); Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), affirmed, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). See also Giles v. State, 632 So.2d 568, 571-72 (Ala.Cr.App.1992), affirmed, 632 So.2d 577 (Ala.1993), citing Ex parte Haney, 603 So.2d 412, 419 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
When a defendant argues and introduces evidence during sentencing as to certain nonstatutory mitigating circumstances, a trial court should enter specific findings regarding its determination as to each of those nonstatutory mitigating circumstances. For that reason, this court has remanded a number of cases for the trial court to make such findings. See Henderson v. State, 584 So.2d 841 (Ala.Cr.App.1988) (remand required for trial court to enter specific findings as to whether defendant's low I.Q. score constituted a nonstatutory mitigating circumstance); Carroll v. State, 599 So.2d 1253 (Ala.Cr.App. 1992), affirmed, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994) (this court remanded as to sentencing because the trial court's findings concerning the mitigating circumstances were unclear and the trial court failed to state whether it considered the evidence of the defendant's mental health as a nonstatutory mitigating circumstance and whether it gave that evidence any weight or significance, citing § 13A-5-47(d) for the requirement that the trial court enter specific written findings concerning the existence or nonexistence of each mitigating circumstance enumerated within § 13A-5-51, as well as any additional non-statutory mitigating circumstances). In Murry v. State, 562 So.2d 1348 (Ala.Cr.App.1988), this court made it clear that the trial court should be specific in its findings as to nonstatutory mitigating circumstances, as well as statutory mitigating circumstances, in order for appellate courts to completely and effectively review the trial court's determination. This court stated:
"Murry contends that the trial court erred, in its sentencing order, in failing to specify what non-statutory mitigating circumstances it found to be supported by the evidence. Murry is correct in his contention that, although the court acknowledged in its order that Murry had offered evidence in support of several specified non-statutory mitigating circumstances, the court failed to make any findings on the existence or non-existence of some of these circumstances. For example, the court made no finding on the existence or non-existence of Murry's work record as a non-statutory mitigating circumstance. In addition, the court apparently addressed and rejected several of Murry's proposed non-statutory circumstances by finding that `Murry was not a person of good character.' We must reject the attorney general's argument that this general finding is sufficient for us to infer that the court considered and rejected the more specific circumstances. For instance, we cannot assume, from the court's general finding that Murry was not of good character, that the trial court addressed and rejected the proposed mitigating circumstance of Murry's *1147 cooperation with the law enforcement authorities.
"Moreover, § 13A-5-47(d) requires that `the trial court shall enter specific written findings concerning the existence or non-existence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional mitigating circumstances offered pursuant to § 13A-5-52.'... Moreover, in our review, we have noticed that the court did not enter written findings on some of the additional non-statutory mitigating circumstances offered by Murry....
"Based upon the order before us, we cannot determine whether the court considered the evidence offered by the defendant and then determined that it was insufficient or whether the court merely precluded it without consideration. See Ex parte Cochran, 500 So.2d 1179, 1187 (Ala.1985); Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987); Duren v. State, 507 So.2d 111, 120 (Ala.Cr.App.1986), aff'd, 507 So.2d 121 (Ala.), cert. denied, 484 U.S. 905, 108 S.Ct. 249, 98 L.Ed.2d 206 (1987)."
562 So.2d at 1358-59.
However, in the present case, the trial court did make specific findings concerning the existence of the nonstatutory mitigating circumstances offered by the appellant. In fact, the trial court found that those circumstances did exist. The trial court found that the appellant came from a broken home, had a poor prior family history, and had been rejected during childhood and adolescence, and that these circumstances eventually led to a dysfunctional adult life. The fact that the trial court did not use the exact wording used by the appellant and that it listed the circumstances, rather than summarized them in narrative form, does not make its findings improper. The trial court's findings show that the court considered all of the evidence that the appellant presented as possible nonstatutory mitigating evidence and that it found those circumstances to exist. Ex parte Haney, 603 So.2d 412, 419 (Ala.1992). Cf. Jenkins v. State, 627 So.2d 1034 (Ala.Cr.App.1992), affirmed, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994).

XVI
The appellant argues that his requested charges during the guilt phase, which were given by the trial court to the jury, should have been sent back with the jury in deliberations, pursuant to § 12-16-13, Code of Alabama 1975. The appellant argues that, although the record indicates that charges were sent back with the jury at the sentencing phase, the record does not affirmatively show that the charges were sent back with it during its deliberations at the guilt phase.
However, Rule 21.1, Ala.R.Crim.P., effective January 1, 1991, superseded the portion of § 12-16-13, Code of Alabama 1975, cited by the appellant, which states: "Charges which are marked `given' by the trial court judge must be taken by the jury with them on retirement...." Rule 21.1 states: "Neither a copy of the charges against the defendant nor the `given' written instructions shall go into the jury room." Moreover, at the time of this trial, Rule 14, Ala.R.Crim.P. (Temp.), which is substantially the same as Rule 21.1, was in effect.
Therefore, if the appellant's assumption from a silent record that the instructions did not go with the jury into its deliberations at guilt phase was correct, no error occurred. The appellant suffered no prejudice.

XVII
The appellant argues that the introduction and use of allegedly irrelevant and inflammatory photographs of the victim's body deprived him of a fair trial and a reliable sentencing proceeding. The appellant argues that the photographs were irrelevant and more prejudicial than probative.
However, the photographs, which were introduced as exhibits at trial, depict the victim as he was found, show evidence of a struggle, and depict the nature and extent of the wounds suffered by the victim. The photographs were relevant to the issues at trial and served to illustrate how the crime occurred.

*1148 "Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence.... To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent.... The admission of such evidence lies within the sound discretion of the trial court.... Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds.... Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters.... Finally photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors."
Ex parte Siebert, 555 So.2d 780, 783-84 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990).
The appellant suffered no undue prejudice due to the admission of these photographs; moreover, during the trial court's instructions to the jury, it was cautioned that it should not let the photographs improperly influence its emotions or affect its deliberations.

XVIII
The appellant argues that the trial court failed to clarify a jury question before supplementing the jury instructions, in violation of Alabama law and the United States Constitution. The appellant cites the following conversation between the trial court and defense counsel, which transpired after the trial court had answered the jury's question and the jury had recommenced its deliberations:
"THE COURT: `Can the intent to murder be formulated after the robbery starts then it would still be capital murder.' Who knows what they mean by that?
"[Defense counsel]: That is the reason I said that, I didn't understand the question? And when I think we answer a question
"THE COURT: I think I answered as well as I could and gave a balanced answer without saying, `yes or no.'"
The record indicates that, after being informed that the jury had a question, the trial court again instructed the jury on the offense of capital murder, particularly expounding on the definition of "during." Following this supplemental instruction, the trial court asked whether this answered the juror's question. The juror indicated that it did. Thus, there was no error.

XIX
In his reply brief, the appellant raised the additional argument that the evidence linking him to the murder was obtained through a violation of his Fourth Amendment rights; specifically, he argues, that the "be on the lookout" issued by the authorities in South Carolina was not based on reasonable suspicion. The appellant argues that, because the stop of his vehicle was not based on reasonable suspicion, his subsequent arrest was illegal, and the evidence seized as a result of a search of his vehicle should have been suppressed.
The record indicates that a suppression hearing was held outside the presence of the jury on the morning that trial was to begin. An employee of the Saluda County, South Carolina, Sheriff's Department testified that he had arrested the three suspects, including the appellant, for carrying an open container of alcohol, a violation of South Carolina statute. Following the witness's testimony, defense counsel argued that there was no probable cause for the arrest and, therefore, that the appellant's statements were the result of an illegal arrest. The prosecutor responded that the car was stopped because of a "be on the lookout" issued in another county. The prosecutor offered to put the arresting officer back on the stand to testify that this stop was based on that "be on the lookout." The State asserted that the arrest was a result of the officer's seeing open containers of alcohol after the stop was made. The trial court then asked defense counsel whether the witness *1149 should be recalled to testify with regard to the contents of the "be on the lookout." Defense counsel indicated that this was necessary. The witness then retook the stand and testified to the contents of the "be on the lookout." Following this testimony, defense counsel argued that the arrest for the open container of alcohol was a pretext to question the appellant concerning the armed robbery. The appellant's motion to suppress was thereafter denied; the trial court found that the State had demonstrated that the arresting officer had reasonable suspicion to stop the vehicle based on the information contained in the "be on the lookout," and therefore, that the officer had probable cause to arrest.
The appellant now argues that the issuing agency did not have reasonable suspicion to issue the "be on the lookout." Because this argument is being raised for the first time on appeal, in order to constitute reversible error, it must rise to the level of plain error. Rule 45A, Ala.R.App.P.
The record indicates that the "be on the lookout" was supported by reasonable suspicion. The cumulative testimony of the two South Carolina officers indicates that the robbery had been captured on videotape, a description of the suspects had been given to the police, and thereafter the "be on the lookout" was issued. The arresting officer testified that the "be on the lookout" described the vehicle and gave the approximate direction the vehicle would be traveling, and that when he saw a vehicle matching the description, he pulled it over. The officer testified that, as he approached the car, he observed open containers of alcohol in plain view. The three occupants of the vehicle were then arrested on that ground. As the appellant was being booked at the scene, the chief of police from Johnston, South Carolina, who had apparently provided the information for the "be on the lookout," identified the appellant and the occupants as the perpetrators of the robbery.
Therefore, it is clear that the "be on the lookout" was supported by reasonable suspicion. "The knowledge of one officer is imputed to another officer in the situation of a radio call directing a stop." Brinks v. State, 500 So.2d 1311, 1313 (Ala.Cr.App. 1986).

XX
As required by § 13A-5-53, Code of Alabama 1975, we address the propriety of the appellant's conviction and the sentence of death. The appellant was indicted and convicted of capital murder as defined in § 13A-5-40(a)(2), Code of Alabama 1975, for intentional murder committed during the course of a robbery.
The record reflects that the appellant's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Code of Alabama 1975.
A review of the record shows that the trial court correctly found the existence of two aggravating circumstances: that the murder was committed during the course of a robbery and that it was especially heinous, atrocious, and cruel. The facts and evidence presented at trial demonstrate that the victim fought for his life for an extended period, while the appellant savagely and unrelentingly pursued his goal. The trial court correctly found the existence of no statutory mitigating circumstance; however, it properly found the existence of the nonstatutory mitigating circumstances concerning the parental abuse of the appellant, neglect and rejection during childhood and adolescence, as well as a dysfunctional adult life, based on the appellant's trial testimony and the testimony of a psychologist at trial. The court weighed the mitigating and aggravating circumstances and properly determined that the aggravating circumstances outweighed the non-statutory mitigating circumstances. We agree with the trial court's findings.
As required by § 13A-5-53(b)(2), Code of Alabama 1975, this court must independently weigh the aggravating and mitigating circumstances to determine the propriety of the appellant's death sentence. After an independent weighing, this court is convinced that the appellant's sentence of death is the appropriate sentence.
As § 13A-5-53(b)(3), Code of Alabama 1975, provides, we must also address whether *1150 the appellant's sentence was disproportionate or excessive when compared to penalties imposed in similar cases. The appellant's sentence was neither. See Kuenzel v. State, supra; Bradley v. State, 494 So.2d 750 (Ala. Cr.App.1985), affirmed, 494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987); Windsor v. State, 683 So.2d 1013 (Ala.Cr.App.1993), reversed, 683 So.2d 1021 (Ala.1994), on remand, 683 So.2d 1027 (Ala.Cr.App.1994). Two-thirds of all death cases in Alabama involve murders that occur during the course of a robbery. Beck v. State, 396 So.2d 645, 654 n. 5 (Ala.1980).
We have searched the entire record for any error that might have adversely affected the appellant's substantial rights and have found none. Rule 45A, Ala.R.App.P.
The appellant received a fair trial. Therefore, the judgment of the circuit court is due to be, and it is hereby, affirmed.
AFFIRMED.
TAYLOR, P.J., and COBB, J., concur.
PATTERSON, J., concurs in the result only, without opinion.
LONG, J., recuses.
NOTES
[1] Johnston, South Carolina, is approximately 14 miles from Saluda.
[2] Although the appellant sought to suppress the statements at trial, this ground of improper inducement was not stated as a ground.
[3] The record indicates that the jury was composed of five blacks and seven whites, with two black alternate jurors.